SHEPARD AND MORSE LUMBER COMPANY *vs.* ALBERT
R. ELDRIDGE.

Suffolk.    November 10, 1897. — June 29, 1898.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP,
& BARKER, JJ.

*Check — Forged Indorsement — Obligations of Payee and Drawer — Imputa-
tion of Knowledge of Clerk's Fraud — Ratification — Action — Estoppel —
Finding — Evidence. .*

The holder of an unindorsed check, payable to his own order, is under no legal
obligation to the drawer to exercise care as to how the check shall be kept, or
to whom he shall commit its custody, or to see to it that the check shall not be
put in circulation by the forgery of his indorsement, so long as he acts honestly
without collusion; and he is not deprived of his remedy against the drawer by
merely negligently intrusting such a check to a clerk who, due care would have
told him, was dishonest, and thus giving the clerk an opportunity to commit
crime.

The holder of an unindorsed check, payable to his own order, is under no other legal
obligations with reference to it than those which rest upon any holder of com-
mercial paper completed and put in circulation by the maker.

If a check is taken by the payee in absolute extinguishment of the drawer's debt
to him, that circumstance cannot relieve the drawer from his legal obligations
as such; and if the check is stolen from the payee and collected upon a forged
indorsement, that does not furnish a sufficient reason why the loss should remain
upon the payee rather than fall upon the drawer.

The fact that the drawer of a check has been in the habit of buying goods of the
payee for several years, and of making payment by checks, imposes no liability
upon the payee as to the methods in which his business shall be conducted, or
as to what clerks he shall employ.

The payee of a check is not to be charged with the knowledge that it has been
stolen or embezzled and collected upon a forged indorsement, either because
his clerk, who committed the forgery, had that knowledge, or because the means
of knowledge existed in his books of account, so that he would have made the
discovery if his monthly trial balances had been made by an honest clerk.

One who has become the holder of a check is under no duty to give notice to the
drawer and the drawee, or to the public, as of a lost check, if the check is stolen
and collected upon a forged indorsement, and he remains honestly ignorant of
those facts, and incorrectly, but honestly, assumes that it has been collected in
the regular course of his business; nor is there a duty to any one connected
with the check which requires him to examine his books of account, or to make
trial balances, or to discover by any means what has become of the check; and
he is not to be charged with knowledge which he did not in fact have.

If an employer, after he has been told that his clerk has been depositing in a cer-
tain bank to his own credit checks payable to the employer, asks and receives

from the clerk a check on that bank for the amount of a bill due from him to the employer for goods, which check is paid by the bank, and also consents that another check drawn by the clerk upon that bank may be paid and charged against the clerk's deposit therein, this does not work an actual or implied ratification of the clerk's acts in indorsing the checks with his employer's name or in collecting them.

The receipting of bills by the seller of goods without informing the buyer that a prior debt for which a check was given had not been extinguished, if not done with intent to mislead him, will not justify the buyer in inferring that the check has been collected by the seller so as to estop him, in an action to recover the amount of the check, from showing that it had been stolen by his clerk and collected upon a forged indorsement.

A special finding of fact by a judge, sitting without a jury, will be disregarded, where evidence relevant and material to the question was wrongly excluded, even if the finding was correct upon the evidence admitted.

The payee of a check who, the check having been stolen from him, put in circulation by forgery, and paid by the drawee, misleads the drawer to his prejudice, and thereby places him in a worse position than he would otherwise be in with reference to the assertion or protection of his rights resulting from what has been done with the check, is estopped from maintaining an action against the drawer upon the check.

In an action by the payee against the drawer of a check, which had been stolen by the payee's clerk, put in circulation with a forged indorsement, paid by the bank upon which it was drawn, and returned to the drawer, from whom it was obtained afterwards by the payee, who had been informed of the forgery, evidence of what was done by the plaintiff after he knew of the forgery is admissible.

CONTRACT, to recover the amount of two checks payable to the plaintiff and signed by the defendant. Trial in the Superior Court, without a jury, before *Dunbar*, J., who found for the plaintiff; and the defendant alleged exceptions. The facts appear in the opinion.

The case was argued at the bar in November, 1897, and afterwards was submitted on briefs to all the justices.

*L. S. Dabney*, for the defendant.

*W. C. Loring*, for the plaintiff.

BARKER, J. The plaintiff sues upon two checks drawn by the defendant upon his banker, one for $446.24, dated January 25, 1895, the other for $561.97, dated July 20, 1895. Both were written to the plaintiff's order, and were mailed by the defendant to the plaintiff in payment of bills for goods bought by the defendant of the plaintiff. Each check was duly received by the plaintiff, and the bills for which the checks were sent in payment were duly receipted by the plaintiff, and returned to the defendant, one on January 26, 1895, and the other on July

24, 1895. The check for January 25, 1895, was presented at the bank on which it was drawn on January 30, 1895. It then purported to bear the indorsement of the plaintiff, and other indorsements, one of which was that of the cashier of the Merchants' National Bank of New Bedford, by whom it was presented, and on that day the amount of the check was paid by the National Bank of Wareham, on which it was drawn, to the Merchants' National Bank of New Bedford, and the same amount was charged to the defendant's account by the National Bank of Wareham. This check was returned to the defendant by his bank on June 25, 1895, and remained in his possession until January 30, 1896.

The check of July 20, 1895, was drawn upon the National Bank of Wareham, and was presented to that bank on July 29, 1895, purporting to bear the plaintiff's indorsement and other indorsements, one of which was that of the cashier of the Merchants' National Bank of New Bedford, and on that day the amount of the check was paid by the National Bank of Wareham to the Merchants' National Bank of New Bedford, and was charged to the defendant's account by the National Bank of Wareham, and this check was returned by that bank to the defendant on November 29, 1895, and remained in his possession until January 30, 1896.

The evidence tended to show that the indorsements upon these checks purporting to be those of the plaintiff when they were paid by the Wareham National Bank were forgeries made by a clerk in the employment of the plaintiff, which clerk had feloniously converted the checks to his own use, had forged upon them the plaintiff's indorsements, and had deposited the checks with the forged indorsements to his own credit in the Old Colony Trust Company, by which they were collected of the Wareham National Bank through the Merchants' National Bank of New Bedford. It appeared that the plaintiff, on January 29, 1896, was informed of these forgeries, and of the misappropriation by its clerk of these checks. Thereupon the plaintiff sent one Gray to the defendant to procure the checks, and the defendant handed them to Gray on January 30, 1896, under circumstances which the defendant offered to show, but evidence of which was excluded. On the same day, or the next day, the

plaintiff notified the indorsers of the checks that the plaintiff's indorsements upon them were forgeries. The plaintiff gave no such notice to the National Bank of Wareham, and no other notice, except the oral statements of Gray made in obtaining the checks from the defendant on January 30, 1896, was given by the plaintiff to the defendant until February 10, 1896, when the plaintiff wrote to the defendant a letter which stated that the checks bore forged indorsements of the plaintiff.

On February 12, 1896, the plaintiff indorsed the checks upon allonges, and forwarded them to its bankers for collection from the Wareham National Bank. Payment was refused by that bank, and the checks were protested by a notary public for non-payment on February 14, 1896, after which this suit was brought upon them by the plaintiff, the payee, against the defendant, the drawer of the checks.

The National Bank of Wareham is solvent.

The case was tried by a judge of the Superior Court, without a jury, and after a finding for the plaintiff, the defendant's exceptions are before us for consideration. It appears from the bill of exceptions that at the trial much evidence was admitted *de bene*, which was afterwards stricken out at the plaintiff's request, and also that much evidence offered by the defendant was excluded. Two findings of specific facts were made in connection with the refusal of the court to give rulings asked by the defendant at the close of the evidence. The questions for decision will be better understood after a statement of the facts which the evidence introduced or offered tended to prove in addition to those already recited.

The plaintiff is a dealer in lumber, with its place of business in Boston. The defendant is a dealer in lumber, with his place of business in Bourne. The defendant had been dealing with the plaintiff for some ten years, buying lumber of the plaintiff once in three or four months. When he bought lumber the plaintiff sent him a bill, and he usually paid it by mailing back the bill with a check for the amount. A receipted bill was then returned to him, in which payment was usually acknowledged for the plaintiff by Harry M. Fowle, who had authority so to do, and who was the clerk who forged the plaintiff's indorsements upon the checks in suit, and converted them to his own use.

Fowle entered the plaintiff's employment in January, 1889, at the age of seventeen or eighteen, in answer to an advertisement, and was first set to do office boy's work. In 1893, when twenty-one years old, he became the ledger clerk, and so continued until his arrest in January, 1896. There were ten or more persons in the plaintiff's office, including its president, treasurer, and directors. Its treasurer was H. B. Shepard, and its cashier was H. S. Shepard, who took care of the money, kept the cash account, and made entries on the cash books. Fowle's duties were to receive and open letters, look over checks, statements, and settlements of accounts as they came in, and see that they were proper and in accordance with the ledger, to receipt and return to customers their paid bills, to post to the ledger, and to take off trial balances. Accounts of the plaintiff's business were kept in the ledgers, cash book, bill books, journals, and check books, and a trial balance was taken by Fowle each month of the business of the last preceding month. The treasurer had his desk in the office, and at his pleasure had access to all the books, and he occasionally examined the books and the trial balances.

The letters received were often opened by Fowle, and when not opened by him those which contained checks in payment for merchandise were placed with the bills upon his desk for him to examine the bills and the ledger with the checks, and see if the proper settlement had been made, and to receipt the bills and return them receipted to the customer. It was Fowle's duty after the examination to pass the checks to the cashier, and at the close of the day to give him a list of the payments, and this course of business was known to the treasurer, and was pursued with the authority and assent of the plaintiff.

The checks sued upon, with the accompanying bills, were received by mail at the office, each within a day or two after its date, and, in the usual course of business, were placed upon Fowle's desk, and intrusted to him for the usual examination, and to be thereafter handed to the cashier as usual. A receipted bill for the payment by each of these checks was sent to the defendant, the acknowledgment of payment being stamped upon the bill with a stamp furnished for that purpose by the plaintiff, and which Fowle had authority to use in receipting bills.

The plaintiff's name, as it appears in the forged indorsements, was stamped upon the backs of the checks with a stamp which the plaintiff provided to be used in making indorsements, and which was kept with other stamps in the office in the cashier's desk. The words, " H. B. Shepard, Treas.," following the plaintiff's name in the indorsements, were written by Fowle. He also sometimes stamped the checks which were to be deposited by the plaintiff with another stamp provided by the plaintiff, and to which Fowle had access, and which stamped on them the words, " For deposit only to the credit of Shepard & Morse Lumber Co."

After the receipt by the plaintiff of the check of January 25, 1895, and the return to the defendant of the receipted bill acknowledging payment, and before the giving of the check of July 20, 1895, the defendant bought of the plaintiff two other invoices of lumber, and paid for them in the same way, with his checks mailed to the plaintiff with the bills which had been sent out by the plaintiff, and neither of these bills contained any reference to any other unpaid bill, and he received in due course receipts acknowledging the payment of both of the intervening bills.

The two bills for which the checks sued upon were given appeared, by the plaintiff's ledger, to have been paid, and in each instance the amount of the check was credited to the defendant in the ledger account in Fowle's handwriting, with a reference in each instance to a page which should have been a page of the cash book, but the cash book had no corresponding items. An examination of the books after the credit of the check of January 25, 1895, to the defendant's account in the ledger, would have shown that no such payment appeared upon the cash book. The trial balance made by Fowle at the end of January, 1895, was forced by him, by omitting from the entry of sundries credited to merchandise on January 31, a sum equal to the amount of the check. If this trial balance had been made up by an honest clerk, the loss of the check of January 25, 1895, would have been then discovered, and, in like manner, if the plaintiff's trial balance for July, 1895, had been made up by an honest clerk, the loss of the check of July 20, 1895, would have been discovered in August, 1895.

Fowle had been defrauding the plaintiff for two or three years before January, 1896, by taking checks sent in by its customers

in payment, falsely indorsing them as he indorsed the checks in suit, collecting them for his own benefit, and concealing these frauds by crediting the checks upon the ledger to the persons who sent them in payment, deducting the amounts from the monthly credits to merchandise, and forcing the trial balances, so that if the monthly trial balances made before January, 1895, had been made by an honest clerk, the stealings of Fowle would have been discovered before that time. During the same period he had defrauded the plaintiff in other ways. The whole amount which he had taken from the plaintiff by misappropriating about one hundred checks of customers was more than $40,000. He kept a complete list of all the checks and money which he had taken. From some time in 1893 he had a deposit account with the Old Colony Trust Company, and he deposited to his credit in that account the checks in suit, and also most of the other checks belonging to the plaintiff and payable to its order, on which he forged its indorsement, and which he converted to his own use in a similar way. He also deposited to his own credit in the same account, from time to time, other funds, and from time to time he drew checks upon the Old Colony Trust Company against this account. Through February and March and August and September, 1895, he had money to his credit on deposit in the Old Colony Trust Company, and also in January, 1896.

In December, 1895, and two or three times before that, the plaintiff's treasurer had his attention called to the fact that Fowle was spending more than his salary, and in consequence the treasurer, in December, 1895, looked over the journal and the ledger to some extent, but he made no other examination of the books, and had no one else make any examination. On January 27, 1896, the plaintiff's treasurer was told by one of the plaintiff's clerks that Fowle had deposited to his own credit in the Old Colony Trust Company checks payable to the plaintiff's order. The treasurer thereupon ascertained from the Trust Company that Fowle had deposited with it such checks, and requested the Trust Company to have the banks upon which the checks were drawn return them, so that he could see the indorsements. He then consulted an attorney. Fowle owed the plaintiff a bill for lumber, and on January 28, 1896, the plaintiff, through its treasurer, took from Fowle a check for $193.20,

upon the Old Colony Trust Company, in payment of the lumber bill, which was for lumber used in building a house of Fowle's in Clifton. This check was paid by the Trust Company on January 29, 1896. On that day Fowle was arrested at the instance of the plaintiff, and upon that day he gave to the plaintiff's treasurer a complete list of all the plaintiff's checks which he had misappropriated by forgery, including the checks now in suit. On the same day the plaintiff brought suit against Fowle in an action of tort or contract, in which the damages were laid at $10,000, and on the writ real estate belonging to Fowle was attached. The declaration was for money obtained by false representations, or wrongfully taken or embezzled, but did not include the checks now in suit. A judgment for the plaintiff has been entered in the suit, upon which execution has issued. Before Fowle's arrest and after the plaintiff's treasurer knew that checks payable to the plaintiff's order had been deposited by Fowle to his own credit in the Old Colony Trust Company, another check, drawn for $140 by Fowle upon that company, was, on January 29, 1896, with the consent of the plaintiff, paid by the Old Colony Trust Company, and charged against Fowle's deposit.

On the same day, after obtaining from Fowle the full list of misappropriated checks, including the checks in suit, the plaintiff sent one Gray to the defendant to obtain the checks in suit. Gray got them, and brought them to the plaintiff's treasurer on January 30 or 31. To obtain the checks, Gray told the defendant that the plaintiff wanted the two checks to see whether the indorsements were forgeries. The defendant, after finding the checks among the vouchers returned from his bank, said he did not think they were forgeries; that the signatures looked like Shepard's; and the defendant got out some letters with Shepard's signature and compared them, and thought the indorsements were not forgeries, and so stated. Gray asked to have the checks, telling the defendant that the purpose for which he wanted them was for a prosecution for forgery, and that if they turned out to be forged no harm should come to the defendant in letting them go out of his possession. On the faith of these assurances, and on the further statement of Gray that the checks should be returned to the defendant when the prosecution for

forgery should be finished, and on the faith of a written receipt the defendant allowed Gray to take the checks. The receipt was of the following tenor:

"Bourne, Mass., Jan. 30, 1896.

"Received of A. R. Eldridge Paid Checks, no number, dated Jan. 25th and July 20, 1895, amounting to 446.24 and 561.97, respectively. To be returned when the case is finished.

"Shepard & Morse L. Co.,
per Geo. F. Gray."

When the plaintiff's treasurer, on January 30 or 31, got these checks from Gray, he immediately saw that the indorsements of his signatures thereon were forgeries, and he immediately gave notice to all the indorsers, except Fowle, that those indorsements were forgeries, but he gave no notice at that time to the National Bank of Wareham, and he gave no notice to the defendant until February 10, 1896, when he sent a letter of the following tenor:

"Boston, February 10, 1896.

"Mr. A. R. Eldridge, Bourne, Mass.

"Dear Sir,—The Shepard & Morse Lumber Company desires to acknowledge the receipt from your concern of the following checks drawn by you on the National Bank of Wareham, Mass., payable to the order of the Shepard & Morse Lumber Company, and all bearing forged indorsements, Shepard & Morse Lumber Company, H. B. Shepard, Treas.

"Date Jan. 25, 1895, amount $446.24; date July 20, 1895, amount $561.97.

"Shepard & Morse Lumber Co.,
By H. B. Shepard, Treas."

The first notice of the forgeries which is shown to have been given to the Wareham National Bank is that which was contained in the plaintiff's indorsements upon the allonges, stating that the checks were for the first time indorsed by the Shepard and Morse Lumber Company by those indorsements dated February 12, 1896, and that no prior indorsements were recognized, which allonges annexed to the checks were presented to the Wareham Bank on February 14, 1896, when payment of the checks was demanded and refused.

Besides his pay from the plaintiff, which was twenty dollars a

week, and his deposit in the Old Colony Trust Company, Fowle had other property. Soon after he became the ledger clerk he told the plaintiff's treasurer that he had inherited considerable property from his father, who had been a partner in Fowle, Torrey, and Company, carpet dealers in Boston, and that he was not obliged to work. In December, 1895, the treasurer, after hearing that Fowle was spending more than his salary, inquired of a gentleman who might be supposed to know how much Fowle had inherited from his father. The reply was that Fowle did inherit, but that the gentleman did not know how much; that he judged from his style of living that he had inherited considerable property, but did not know, or have means of knowing, how much, and the treasurer made no further inquiry. On February 10, 1896, Fowle was absolutely insolvent, and has been so ever since.

The evidence offered by the defendant to prove many of the facts above recited was excluded at the trial, and, at the close of the evidence, so much of it as had been admitted *de bene*, and tended to prove lavish expenditures on the part of Fowle, and to show the extent of the plaintiff's losses by Fowle's depredations, was stricken out.

The defendant's requests for rulings, however, were framed as if all the evidence were in, and, in refusing them, the judge made two special findings of fact, which were, in substance, that the defendant's position had not been changed to his prejudice after the misappropriation of the checks by Fowle, and that Fowle was not permitted by the plaintiff's negligence to obtain payment of either check.

The requests for rulings were, in substance, that the plaintiff could not maintain the action ; that the plaintiff's neglect after the discovery of the forgery of the indorsements to give notice of the same to the defendant until February 10 was an unreasonable delay, which of itself discharged the defendant; that it was an unreasonable delay which discharged the defendant if his position had in the mean time been changed to his prejudice ; that the assurances given by the plaintiff through Gray on January 30, 1896, to induce the defendant to give up the checks then in his possession, and the receipt then given by Gray are an adoption and ratification of the indorsements and of the pay-

ment of the checks thereon, so that the defendant cannot be held liable on the checks; also, that those assurances and the receipt estop the plaintiff from maintaining the action if the defendant's position was changed to his prejudice by giving up the checks, and that his position was so changed.

There were also requests with reference to the trial balances for February and July, 1896, to the effect that, if the examination of the books for making up the trial balances would have disclosed to an honest clerk the loss of the checks, and brought to the plaintiff's knowledge facts which, by the exercise of due care and diligence, would have disclosed the forgeries, the plaintiff cannot escape the knowledge to be thereby imputed to it because the examinations and trial balances were made by Fowle; that the plaintiff must be deemed to have had knowledge of the first forgery in February, 1895, and of the second in August, 1895, and cannot recover, because it did not give notice of the forgeries to the defendant at those times, and because of unreasonable delay after those dates in giving notice to the defendant, and because of the delay since those dates, if the defendant's position has been changed to his prejudice.  There were also requests to the effect that, if Fowle was permitted by the negligence of the plaintiff to get possession of the checks, and to obtain payment on them, the plaintiff could not recover, and that, if in the month after each check were given, the plaintiff had means of knowledge that the check had been taken from it and collected by Fowle, and remained ignorant of those facts by reason of its want of ordinary care, the plaintiff could not recover on the check, and that in those circumstances it could not recover on the check, if, in the mean time, the defendant's position had been altered to his prejudice.

There was also a request to the effect that, if the plaintiff knew that the defendant was its regular customer, and that he had been buying lumber of it for years, paying for it with his checks sent to the plaintiff by mail, and that Fowle on the receipt of such checks was in the habit of receipting the bills and returning them to the defendant as paid, and that he was authorized so to do, and if the plaintiff knew, or had reason to believe, that the defendant relied upon the return of the receipts as evidence that his checks had been duly received by the plaintiff

and had been duly honored, and had been collected by it, it was the plaintiff's duty to take reasonable care of such checks, and to use ordinary care in availing itself of the means of information in its possession to ascertain whether such checks were duly collected for its account, and it was bound to the defendant to know at any time when, by the use of ordinary care, it had the means of knowledge in its possession that it had lost without receiving payment any check so received from the defendant, and at once to inform the defendant thereof, and that a failure so to inform itself and to notify the defendant would discharge him.

There were further requests to the effect that the plaintiff's action in asking for and taking from Fowle the check given by him to the plaintiff on January 28, 1896, after the plaintiff knew that Fowle had deposited to his own credit checks payable to the plaintiff was a ratification by it of Fowle's appropriation to his own use of the checks, and that the plaintiff's action in requesting the Old Colony Trust Company to pay checks of Fowle's after the plaintiff had such knowledge was such a ratification.

One question for decision is whether the plaintiff can recover if, by its own negligence in the conduct of its business, Fowle was in its employ and intrusted with the possession of the checks, when ordinary care would have shown the plaintiff that Fowle was dishonest, and had already stolen from it and collected by forging the plaintiff's indorsement many checks previously sent to it by its customers.

The finding of fact that Fowle was not permitted by the negligence of the plaintiff to obtain payment of either check does not render this question immaterial, because, if the plaintiff's negligence in this regard was a material consideration, much evidence relevant to it was stricken out or excluded, and the finding made without considering that evidence has no weight. It is apparent that the judge below considered such negligence on the part of the plaintiff wholly immaterial. If it was so, the exclusion of evidence tending to establish it did the defendant no harm; but the finding of fact must be laid one side, and, notwithstanding that finding, we must inquire whether the plaintiff's negligence, if it could be found from the evidence offered, was a defence.

The doctrine of contributory negligence as a defence to ac-

tions of tort is now of most frequent application, but we have been referred to no instance in which it has been held applicable to actions upon commercial paper, or even when the holder of such paper sues in tort for its conversion one who has innocently taken it upon a forged indorsement. Nothing could more completely unsettle commercial dealings than to extend that doctrine to suits brought by holders of negotiable paper against other parties thereto. If any change is to be made in the law looking to the discouragement of negligence on the part of holders of such paper, and to the protection of parties who may be defrauded by the forgery of indorsements, it should be made by the Legislature, as in the case of the English statutes as to indorsements of checks and bills upon bankers. See St. 16 & 17 Vict. c. 59, § 19; 45 & 46 Vict. c. 61, § 60.

We are of opinion that the holder of an unindorsed check, payable to his own order, is under no legal obligation to the drawer to exercise care as to how the check shall be kept, or to whom he shall commit its custody, or to see to it that the check shall not be put in circulation by the forgery of his indorsement, so long as he acts honestly without collusion. Such a holder is not deprived of his remedy against the drawer by merely negligently intrusting such a check to a clerk who, due care would have told him, was dishonest, and thus giving the clerk an opportunity to commit crime. He has the right to assume that his clerk will not commit a crime, and to rest upon the presumption that he has not stolen or forged, and will not do so, and he is under no legal obligation, either to the drawer of the check or to the public, to see to it that the check is not put in circulation with a forged indorsement. *Combs* v. *Scott*, 12 Allen, 493, 497 *Belknap* v. *National Bank of North America*, 100 Mass. 376 *Greenfield Savings Bank* v. *Stowell*, 123 Mass. 196. *Mackintosh* v. *Eliot National Bank*, 123 Mass. 393, 395. *Mount Morris Bank* v. *Gorham*, 169 Mass. 519, 521. *Patent Safety Gun Cotton Co.* v. *Wilson*, 49 L. J. Q. B. (N. S.) 713. *Société Générale* v. *Metropolitan Bank*, 27 L. T. (N. S.) 849, 858. *Scholfield* v. *Londesborough*, [1896] App. Cas. 514. *Bank of Ireland* v. *Evans Charities*, 5 H. L. Cas. 389. *Ogden* v. *Benas*, L. R. 9 C. P. 513. *Fine Art Society* v. *Union Bank*, 17 Q. B. D. 705. *Swan* v. *North British Australasian Co.* 2 H. & C. 175, 189. *Arnold* v. *Cheque Bank*, 1 C. P. D. 578, 588.

Such a holder of a negotiable check is under no other legal obligations with reference to it than those which rest upon any holder of commercial paper completed and put in circulation by the maker. If the check is stolen from him and put in circulation by means of the forgery of his indorsement, he is not answerable as is one who intrusts to another his signature or indorsement in blank with authority to use it in making or giving currency to negotiable paper. The doctrine of *Putnam* v. *Sullivan*, 4 Mass. 45, and of *Young* v. *Grote*, 4 Bing. 253, does not apply, and it cannot properly be extended to the case of a completed check already in circulation and intrusted by the holder to a clerk for purposes which neither give nor imply any authority to pass it on to another holder, nor give the clerk any power to do so, without the commission of a crime.

It is not necessary now to determine whether the debts for which the checks were given were extinguished. If the checks were taken by the plaintiff in absolute extinguishment of the debts, that circumstance could not relieve the drawer from his legal obligations as drawer. While the drawer has done his duty, and it is through no fault of his that the payee does not get his money, if the check is stolen from him and collected upon a forged indorsement, that does not furnish a sufficient reason why the loss should remain upon the payee rather than fall upon the drawer. The check was received in payment and the debt extinguished only in consideration of the drawer's legal obligation as drawer and of the payee's rights as holder, which included the right of recourse to the drawer if upon proper indorsement and due demand the check should not be paid by the drawee. Although there are intimations in support of the theory that cases like the present are instances in which as to two innocent parties losses are to be left where they fall, we think the rights of the present parties must be worked out by considering the usual rights of the drawer and drawee of a check given in a commercial transaction. See *Thomson* v. *Bank of British North America*, 82 N. Y. 1, 8; Morse, Banks & Banking, § 395.

The fact that the defendant had been in the habit of buying goods of the plaintiff for ten years, and of making payment by checks, imposed no liability upon the plaintiff as to the methods

in which its own business should be conducted, or as to what clerks it should employ. So far as these checks are concerned, its obligations to the defendant were merely those defined by the law of negotiable paper, and did not include the duty of taking care that the checks should not be stolen or its indorsement forged.

Nor do we think that the plaintiff is to be charged with the knowledge that the checks had been stolen or embezzled, and collected upon its forged indorsements, either because Fowle, its clerk, had that knowledge, or because the means of knowledge existed in the plaintiff's books of account, so that the plaintiff would have made the discovery if its monthly trial balances had been made by an honest clerk. The loss of the checks to the plaintiff was not, in fact, known to it until Fowle's arrest on January 29, 1896, and, as to all other parties to the checks, they were never lost checks. One was paid in four days, and the other in nine days after its date; and they were thenceforth in the custody of the drawee or drawer. Assuming that the owner of a check which he knows to be lost is under a duty to give to the public and to the parties to the check immediate notice of the loss, we see no reason for holding that one who has become the holder of a check is under a duty to give notice to the drawer and the drawee, or to the public, as of a lost check, if the check is in fact stolen and collected upon a forged indorsement, and he remains honestly ignorant of those facts, and incorrectly, but honestly, assumes that it has been collected in the regular course of his business.

Unless the plaintiff was under a duty to give notice as of a lost check, there was no duty to any one connected with the checks which required the plaintiff to examine its books of account, or to make trial balances, or to discover by any means what had become of the checks. Assuming that, if such a duty toward other parties had rested upon the plaintiff, it would be chargeable with the knowledge which Fowle had, or which would have been acquired by the making of the trial balances by an honest clerk, or by an examination of the plaintiff's books by its officers, as the depositor was chargeable with the knowledge of his dishonest clerk to whom he intrusted the examination of returned checks in *Dana* v. *National Bank of Republic,*

132 Mass. 156, since no such duty to others rested upon the plaintiff, it is not to be charged with knowledge which it did not in fact have.  Fowle was himself defrauding the plaintiff in forging the plaintiff's indorsement and collecting the checks for his own use, and therefore his own knowledge of the fraud acquired in its perpetration is not to be imputed to the plaintiff. *Indian Head National Bank* v. *Clark*, 166 Mass. 27, and cases cited.  Nor is this contended.  And as the examinations of the books in making the trial balances were not made in the performance of a duty owed by the plaintiff to any other party, the knowledge of the agent who made those examinations is not to be imputed to the plaintiff, nor is it to be charged with the information which its means of knowledge disclosed, it not being wilfully ignorant, nor having purposely neglected to use the means of knowledge within its power.  *Combs* v. *Scott*, 12 Allen, 493, 497.

As the plaintiff cannot properly be charged with imputed knowledge that Fowle was indorsing with its name these checks, or any of the other checks which he stole or embezzled and collected by forging its indorsement, we find nothing in what occurred until the plaintiff obtained actual knowledge of the frauds to work an actual or implied adoption or ratification of Fowle's acts in indorsing the checks with the plaintiff's name or in collecting them.  The want of actual knowledge is fatal. *Combs* v. *Scott*, 12 Allen, 493.  *Murray* v. *Nelson Lumber Co.* 143 Mass. 250.  *Dole Brothers Co.* v. *Cosmopolitan Preserving Co.* 167 Mass. 481.  The receipting of subsequent bills by the plaintiff without informing the defendant that the debts for which these checks were given had not been extinguished was not an act intended or designed to convey to the defendant any representation as to what had become of the checks in suit, and could not justify the defendant in his inference that the checks had been collected by the plaintiff so as to estop the plaintiff from showing the truth.  The receipting of subsequent bills without mention of the previous checks was not done with the intent to mislead the defendant, nor with any expectation or reason to believe that the defendant would in consequence of it do or omit to do anything with reference to the checks now in suit.  *Stiff* v. *Ashton*, 155 Mass. 130.  *Lincoln* v. *Gay*, 164 Mass. 537.  *Traders' National Bank* v. *Rogers*, 167 Mass. 315, 321.

The remaining question is, whether what occurred after the actual discovery of the frauds requires us to sustain the defendant's exceptions. It is not necessary to consider whether the payee of a check, which has been stolen from him, put in circulation by forgery, and paid by the drawee, upon ascertaining those facts, should give notice to the maker, and to those who have taken the check as rightfully in circulation, of such facts within the payee's knowledge as are material to the rights and obligations of such persons, growing out of their transactions with the check. A majority of the court is of the opinion that a payee who, under such circumstances, misleads the drawer to his prejudice, and thereby places him in a worse position than he would otherwise be in with reference to the assertion or protection of his rights resulting from what has been done with the check, is thereby estopped from maintaining an action against the drawer upon the check, and that, for this reason, the exceptions should be sustained, and the finding for the plaintiff should be set aside.

It is true that it was found specially that the defendant's position had not been changed to his prejudice. But this finding must be disregarded, because evidence relevant and material to the question was offered by the defendant and wrongly excluded, even if the finding was correct upon the evidence admitted, which we do not decide. The evidence offered and excluded to show upon what footing and by what representations and assurances the plaintiff through Gray got the checks from the defendant was material upon the questions whether the plaintiff was estopped by its own acts done after its discovery of the forgeries from collecting the checks of the defendant; and whether the plaintiff had adopted as to him the forged indorsements. So also the evidence of the plaintiff's acts between its discovery of Fowle's frauds and its demand for payment of the checks from the drawee on February 14 was material in determining whether the defendant had been prejudiced in his rights to recover against the drawee.

To say nothing of the plaintiff's omission to notify the defendant of its own purpose to treat the checks as unpaid checks and to collect them of the defendant, the plaintiff's act in getting the checks from the defendant on January 30 as paid

checks was intended by the plaintiff to change the defendant's position, and did change it by depriving him of the possession of the checks. They had come to the defendant's hands honestly, and as vouchers for charges made against him by the drawee. Even if they had been demanded of him by the plaintiff as its property, the defendant could honestly refuse to give them up, and could honestly at once return them to the drawee with notice of the facts, and thus save himself from loss by perfecting his right to recover from the drawee the amount of the unauthorized payments which the drawee had charged against him in account. See *Northampton National Bank* v. *Smith*, 169 Mass. 281.

The enforcement of the defendant's rights against the drawee was not so plain and easy for him without as with the possession of the checks, and the loss of possession itself might have been found a change in his position to his prejudice. Besides this, the plaintiff's act in getting the checks from the defendant as paid checks, without notifying him that the plaintiff claimed them as its own property, and intended to collect them, while at the same time giving the defendant information that the plaintiff's indorsements were forged, would naturally induce the defendant to omit to give information of the forgery to the drawee, and it does not appear that any information was given to the drawee until the checks were again demanded of it on February 14. The fact that the drawee has always been solvent, and remains solvent, is not the only factor in determining whether the defendant has lost his rights against the drawee. See *Dana* v. *National Bank of Republic*, 132 Mass. 156; *Leather Manufacturers' Bank* v. *Morgan*, 117 U. S. 96; *Leather Manufacturers' Bank* v. *Merchants' Bank*, 128 U. S. 26.

Without discussing that question, we think the evidence as to what was done by the plaintiff after it knew of the forgeries should have been admitted, and that if it appeared that the plaintiff got the checks from the defendant as paid checks, to be returned to him, and did not properly notify the defendant that the plaintiff claimed the checks as unpaid and as its own property, and that it intended to assert that ownership and collect the checks, a finding for the defendant would be warranted.

*Exceptions sustained.*