**SPERRY RAND CORPORATION, Defendant, Appellant,**

v.

**William R. HILL, Jr., Plaintiff, Appellee.**

**No. 6556.**

United States Court of Appeals First Circuit.

Heard Nov. 4, 1965.

Decided Jan. 18, 1966.

Lawrence R. Cohen, Boston, Mass., with whom Joseph W. Lobdell, Boston, Mass., and Newton H. Levee, Boston, Mass., were on brief, for appellant.

C. Keefe Hurley, Boston, Mass., with whom Earle C. Cooley, Boston, Mass., was on brief, for appellee.

Before ALDRICH, Chief Judge, HASTIE* and McENTEE, Circuit Judges.

ALDRICH, Chief Judge.

Plaintiff, a citizen of Massachusetts, is a physician specializing in dermatology. Defendant is a Delaware corporation with principal offices in New York and Connecticut. Plaintiff brought this action in the district court for the District of Massachusetts, seeking damages for libel and for violation of New York's so-called right of privacy statute, N.Y.Civil Rights Law, McKinney's Consol.Laws, c. 6, § 51.[1] Although the publications complained of were made throughout the country, the case was submitted on the basis of damages suffered in Massachusetts and New York, only. At the conclusion of the trial the jury answered a number of special questions. It awarded $50,000 actual damages, based upon libel in Massachusetts and New York and invasion of privacy under the New York statute, combined, and also awarded $200,000 punitive damages for libel and the right of privacy combined, limited to New York.[2] The court refused to direct a judgment n. o. v., or to grant a new trial, and defendant appeals.

The facts must be stated in some detail. Defendant manufactures an electric shaver known as the Remington, which is supposedly unique in having adjustable roller combs. In June 1958 defendant was approached by one Paul Murphy, who operated under the name of Medical Research Association, hereinafter MRA, and specialized in "medical public relations." Murphy reported upon a pilot study which indicated that the Remington was better for the skin than ordinary razors and other electric shavers. He proposed a more elaborate pilot study, and suggested that if it worked out, he would arrange for a medical research project to be financed by the defendant. If the project resulted in a paper published in a recognized medical journal, it would be used as the theme for a national advertising campaign. After an investigation of Murphy and his associates, which showed them to be apparently reliable, defendant agreed. Informed of the successful outcome of the second study, defendant entered into a written contract with MRA by means of two letters. We accept the following summary from plaintiff's brief.

"The first letter was dated November 10, 1958. It provided that a 'protracted medical research study' was to be performed by a team of three dermatologists on the staffs of leading institutions and the dermatologists selected had to be 'agreeable' to defendant.[3] The subjects of the study were to be approximately 240 males and 60 females. The study was to be conducted according to protocol previously established and agreed upon by MRA and defendant.[4] MRA agreed to make progress reports to defendant every 30-45 days and to keep confidential any unfavorable findings. After completion of the study, a medical report bearing the by-lines of the three doctors was to be pre-

---

* By designation.

1. Plaintiff waived any claim for invasion of privacy in Massachusetts.

2. Massachusetts does not allow punitive damages for libel. Mass.G.L. c. 231, § 93.

3. This meant only that defendant would approve their qualifications.

4. This "protocol" established an elaborate research procedure.

pared for publication in a mutually agreed upon national medical or scientific journal. However, the report was not to be submitted for publication without being reviewed and approved in writing by defendant. MRA, subject to the approval and control of defendant, was to obtain newspaper and magazine publicity throughout the United States and Canada.

"The second letter was dated November 11, 1958. It provided that defendant would be permitted to use the research as a basis for advertising claims, provided the names of the physicians and their institutions were not used. This proviso was agreed to be necessary under the established rules of ethics of the American Medical Association. Nevertheless, defendant would be permitted to make mailings of the medical journal report to members of the general public, as well as to doctors and medical institutions. It was agreed that nothing would be published without first being reviewed and approved in writing by the physicians. It was further agreed that MRA would receive $35,000 to cover the research, the three dermatologists, the medical journal report and the reading of the report before a medical convention. MRA would receive an additional $50,000 for placing a story in 500 newspapers quoting one or more of the dermatologists and mentioning the trade name of defendant's electric shaver. Finally, if defendant wanted MRA to place magazine publicity, it would pay for the same according to a schedule of rates."

Pursuant to this contract Murphy entered into an agreement with a Dr. Finnerty, a dermatologist, under which Dr. Finnerty would arrange to collaborate with two other dermatologists to conduct the research and prepare a paper. At some point Dr. Finnerty proposed and Murphy agreed that the other doctors were to be the plaintiff and a Dr. Messina, now deceased. Murphy so informed the defendant, who approved the doctors without seeing them or having any communication with them. Periodically thereafter as often as every two or three weeks, Murphy informed the defendant of the progress allegedly being made by the doctors. In fact the plaintiff, and possibly Dr. Messina as well, never participated in any study. What, if anything, Dr. Finnerty himself did, unquestionably fell notably short of the contract requirements.[5]

Whether plaintiff consented to the use of his name in connection with the study, or as a co-author of the article allegedly resulting therefrom, even though he did not in fact participate, was a matter of dispute at the trial. Dr. Finnerty testified that he met the plaintiff and Dr. Messina at a sidewalk cafe during the summer of 1958, that he told them he was conducting a study on shaving and would like to use their names as co-authors, that he would pay them $500 each when the paper was published, and that they both agreed. Dr. Messina, having died in December 1959, could not corroborate or deny this testimony. Plaintiff denied it. The jury, in answer to a special question, credited the plaintiff. While much of plaintiff's conduct makes it difficult to believe his denial, defendant did not contend, even on the motion for a new trial, that the evidence did not warrant the jury's finding. We, too, must accept it. However, on uncontradicted evidence introduced by the plaintiff, defendant's officers had no doubt, or reason to doubt, that the study was fully and properly carried out. Murphy's knowledge is another matter, and one question in the case is whether his knowledge is legally imputable to the defendant.

5. Dr. Finnerty admitted various important departures from the contract besides his failure to obtain the participation of the other doctors. He was unable to furnish any records, or to give the name of a single patient who had participated in research which, supposedly, had required the use of 720 electric shavers.

In due course the alleged results of the purported study were set out in a so-called long report which, if not written mainly by Murphy rather than Dr. Finnerty, at least contained many of Murphy's suggestions or improvements. This report was furnished to the defendant and gone over by its representatives together with Murphy and some of his associates. Various parties made suggestions, and eventually the report was rewritten into an article, primarily by an employee of Murphy. It has not been argued, and we find no basis for contending, that the article departed from the report in any basic manner, but it did, no doubt, give special prominence to alleged findings pleasing to the dedefendant, and defendant's shaver was the only one mentioned by name. In 1960, Murphy submitted the article entitled "Modern Shaving Techniques in Relation to Lesions of the Skin," to GP, a national medical magazine, which published it in March 1961.

Thereafter, defendant instituted an extensive national advertising campaign. It began with full-page advertisements in the Boston newspapers in early May, 1961, and was followed by advertisements in magazines such as Life, Look and the Saturday Evening Post during the mid-summer and fall of that year. These advertisements exploited the article, referring to it as the "Dermatologists' Report," and making much of the fact that the report was written by three supposedly prominent physicians. The advertisements did not identify the authors, but stated, "If you would like more information about 'The Dermatologists' Report,' your doctor may obtain it by writing" to a New York post office box. In response to requests throughout the

summer and fall, defendant furnished a rather small number of reprints to doctors in Massachusetts and New York. Plaintiff's name, along with the names of the other two doctors, appeared as author.

We consider first plaintiff's action under the New York privacy statute,[6] and begin by posing a hypothetical case which may seem far removed from the case at bar. Suppose that a Dr. Black publishes in a medical journal an article, the import of which is that bicycling is good for the circulation of the middle-aged. Suppose, further, that the article comes to the attention of a manufacturer of bicycles who, without obtaining Dr. Black's consent, adverts to the article in advertisements for bicycles, summarizes its conclusions, and offers to send reprints to interested readers or their physicians. We do not believe that the courts of New York would hold the manufacturer's conduct actionable. No right of privacy attaches to a matter of general interest that has already been publicly released in a periodical of national, albeit "specialized," circulation. The article, together with its author's name, has, in effect, been dedicated to public use.[7] Cf. Gautier v. Pro-Football, Inc., 1952, 304 N.Y. 354, 107 N.E.2d 485; Molony v. Boy Comics Publishers, Inc., 1950, 277 App.Div. 166, 98 N.Y.S.2d 119. If, on the other hand, Dr. Black had never written the article attributed to him, we have little doubt that an action would lie under the statute. Cf. Goldberg v. Ideal Publishing Corp., Sup.Ct., 1960, 210 N.Y.S.2d 928; Ravich v. Kling, Sup.Ct., 1959, 17 Misc.2d 683, 187 N.Y.S.2d 272.

This latter would be the situation at hand, were it not for the most inexplicable feature of this unusual case. After

6. We are not without doubt whether, under Massachusetts choice of law rules, plaintiff, a domiciliary of the Commonwealth, could claim the benefits of this statute. See Bernstein v. National Broadcasting Co., D.D.C., 1955, 129 F. Supp. 817, aff'd, 98 U.S.App.D.C. 112, 232 F.2d 369, cert. den. 352 U.S. 945, 77 S.Ct. 267, 1 L.Ed.2d 239; Restatement (Second), Conflict of Laws, § 379g–h

(Tent. Draft No. 9, 1964). In view of our disposition of the statutory claim, we do not reach this question.

7. We say this with full awareness of the distinction that has been drawn between use "for advertising purposes" and use "for purposes of trade". See, e. g., Lahiri v. Daily Mirror, Inc., Sup.Ct., 162 Misc. 776, 1937, 295 N.Y.S. 382.

learning in March of the article's publication, plaintiff consulted counsel. Although plaintiff's testimony is replete with accounts of his continuous mental and other sufferings resulting from the publication and republications, he did nothing else. He did not complain to Dr. Finnerty. Although Dr. Messina was a close friend, he did not speak of it even to him. He did not communicate with GP.[8] Plaintiff testified that he saw the advertisements that appeared prominently in the Boston newspapers in May 1961. He continued to remain silent, although he now knew clearly that the matter had not come to an end.[9] Two months later the advertisements began to appear nationally. In November, plaintiff finally complained to defendant.

Plaintiff's brief asks us "to judicially notice" that his five-month delay in notifying the defendant that he had not participated in the article was reasonable because defendant was "one of the country's largest corporations * * * [with an] elaborate and obviously expensive advertising campaign * * *," so that full investigation was a condition precedent. In addition to the fact that it does not appear that plaintiff did any investigating between May and October (see preceding paragraph), we are less than clear what extended investigation was necessary. If plaintiff had not consented to the use of his name, no one knew it better than himself. By the same token, no one knew better than he that to the extent the advertising relied upon his name or reputation, it was a fraud, or at least a serious mistake of some sort.

█ Plaintiff's claim under the New York statute must rest upon the circumstance that he had not authorized the article in GP. On the basis of plaintiff's long silence, defendant asserts, in effect, that plaintiff is estopped to deny his authorship.[10] With respect to reprints distributed in connection with the national advertising campaign, and hence in New York, we must agree. Prior to the New York advertisements, by the simple act of writing a letter plaintiff could have forestalled further publication and distribution of the reprints, and the consequent harm allegedly suffered by him. Instead, for reasons not easily, or at least not charitably, devined, he chose to sit silently by, allowing the defendant reasonably to entertain the belief that because plaintiff's name appeared on the article he had in fact written it.

Of course, a party having knowledge of a fact cannot claim estoppel merely because he did not learn it from one who should have spoken, and we have assumed that defendant had no independent knowledge. We think this assumption inescapable. The evidence at the trial was uncontradicted that defendant (including its corporate employees) was unaware that plaintiff had not written the article or consented to his name being attached to it. When plaintiff notified defendant to the contrary, it took immediate steps to discontinue distribution of the article. Not only did the defendant not know earlier, but its ignorance was not unreasonable. Defendant had left the matter of dealing with the doctors to Murphy, an agent chosen with adequate care, and the agreement expressly required Murphy to obtain the consent of the participating doctors.

█ This does not end the matter. In answer to a special question, the jury

---

**8.** Plaintiff's counsel wrote GP, but not until October. Even then it was not to inform GP that the article had not been authorized, but only to make inquiries.

**9.** Plaintiff's reasons for delay in notifying defendant, quoted *infra*, as much as concede that he assumed the advertising campaign would continue.

**10.** Plaintiff complains that defendant did not raise the question of estoppel in the district court. This is correct only in a very technical sense. At various stages of the proceeding defendant asserted this defense under the banners of "ratification," "laches," and "mitigation of damages." Plaintiff's knowledge of the advertisements and his ensuing silence were fully developed during the trial.

found that Murphy was defendant's agent. The question remains whether, assuming Murphy knew that plaintiff did not approve the article, Murphy's knowledge can be imputed to the defendant. What an agent learns within the scope of his authority is, normally, imputed to the principal. However, an agent's knowledge of his own unauthorized acts is not imputed, Restatement (Second), Agency § 280; cf. Eastern Advertising Co. v. Standard Nut Co., 1928, 264 Mass. 238, 162 N.E. 339; Innerarity v. Merchants' National Bank, 1885, 139 Mass. 332, 333, 1 N.E. 282; Restatement (Second), Agency § 91, at least when the agent has acted fraudulently toward his principal. Tremont Trust Co. v. Noyes, 1923, 246 Mass. 197, 206–207, 141 N.E. 93; Kiamesha Development Corp. v. Guild Properties, Inc., 1957, 4 A.D.2d 334, 164 N.Y.S.2d 958; Fitch, Cornell & Co. v. Atchison, T. & S.F. Ry., 1915, 170 App.Div. 222, 155 N.Y.S. 1079, aff'd, 226 N.Y. 597, 123 N.E. 864. On plaintiff's own interpretation, Murphy's conduct, to the extent he failed to obtain plaintiff's consent and, a fortiori, to the extent he knew plaintiff had not written the article, was a deliberate violation of the agreement with his principal and a fraud upon the principal.[11]

In a case where the principal is attempting to avoid liability to an innocent party, a greater adverse interest on the agent's part might well be required before insulating the principal from his agent's knowledge. Cf. Seavey, Agency 184–185 (1964). The fiction of imputed knowledge, however, does not exist apart from the policies it serves, and under the present circumstances, in view of plaintiff's conduct, we conclude as a matter of law that defendant was not constructively notified because of any knowledge Murphy may have possessed. We hold that defendant justifiably relied on plaintiff's unjustifiable silence, and that it would be unconscionable to allow plaintiff presently to deny his authorship in order to recover damages accruing on or after July, when the New York advertising commenced.[12] Cf. Looney v. Trimount Theatres, Inc., 1933, 282 Mass. 275, 184 N.E. 683; United Shoe Machinery Co. v. Bresnahan Shoe Machinery Co., 1908, 197 Mass. 206, 215, 83 N.E. 412; Shepard & Morse Lumber Co. v. Eldridge, 1898, 171 Mass. 516, 51 N.E. 9, 41 L.R.A. 617; Rothschild v. Title Guarantee & Trust Co., 1912, 204 N.Y. 458, 462, 97 N.E. 879, 41 L.R.A., N.S., 740; Slud v. Guild Properties, Inc., Sup.Ct., 1952, 6 Misc.2d 188, 119 N.Y.S. 2d 347, aff'd, 280 App.Div. 1018, 116 N.Y.S.2d 748, rev'd on other grounds, 4 A.D.2d 334, 164 N.Y.S.2d 958; Restatement (Second), Agency § 8B(1)(b); and see Shapleigh Hardware Co. v. McCoy & Son, 1919, 23 Ga.App. 265, 98 S.E. 102. But cf. New York Rubber Co. v. Rothery, 1887, 107 N.Y. 310, 14 N.E. 269.

We have no problem with plaintiff's claim for compensatory damages for libel. The jury was clearly warranted in finding that defendant was, at least jointly, responsible for publica-

---

11. Murphy's misconduct was doubtless self-interested; at the least to reduce his own work, at worst to fabricate an article which he could persuade defendant to pay him to circulate.

12. In holding plaintiff estopped to deny his authorship of the article we need not hold that he is estopped to deny that he specifically consented to defendant's commercial use of his name, for, as we have pointed out, if plaintiff wrote the article his consent would not have been necessary. We note, however, that even though the New York decisions might preclude an absolute defense of estoppel to deny consent when written consent was necessary, Lomax v. New Broadcasting Co., 1963, 18 A.D.2d 229, 238 N.Y.S. 2d 781, conduct indicating consent may be considered in mitigation of damages. Ibid.; Miller v. Madison Square Garden Corp., Sup.Ct., 1941, 176 Misc. 714, 28 N.Y.S.2d 811. Under this theory, plaintiff could not recover for damages he could have avoided after it became evident that defendant would continue its advertising campaign. Cf. Den Norske Ameriekalinje Actiesselskabet v. Sun Printing & Publishing Ass'n, 1919, 226 N.Y. 1, 122 N.E. 463; McCormick, Damages, § 37 (1935).

tion of the article in GP. Expert testimony permitted the jury to find that the unauthorized attribution of the article to plaintiff was defamatory. Among the reasons given for saying that the article reflected unfavorably on him were that it was poorly written, scientifically inadequate on its face, and medically unsound. In addition, some physicians would consider it unethical because of the undisguised preference for one manufacturer's product and the mention of its name. Such attributions of lack of ethics to the plaintiff, as well as the deficiencies in the article itself, could be found defamatory. See Themo v. New England Newspaper Pub. Co., 1940, 306 Mass. 54, 56–57, 27 N.E.2d 753; Clevenger v. Baker Voorhis & Co., 1960, 8 N.Y.2d 187, 203 N.Y.S.2d 812, 168 N.E.2d 643. There must be a new trial on the issue of compensatory damages, however. The verdict of $50,000 does not segregate damages for libel from damages under the New York statute which, we have held, cannot be recovered.

■ We reach, finally, the matter of punitive damages for libel under the law of New York,[13] and conclude that New York would not permit recovery on the facts of this case.

Exemplary damages serve to deter and punish conduct that is morally culpable. Faulk v. Aware, Inc., 1963, 19 A.D.2d 464, 244 N.Y.S.2d 259, aff'd, 14 N.Y.2d 899, 252 N.Y.S.2d 95, 200 N.E.2d 778, modi-

fied 14 N.Y.2d 954, 253 N.Y.S.2d 990, 202 N.E.2d 372, cert. den. 380 U.S. 916, 85 S. Ct. 900, 13 L.Ed.2d 801. They are awarded for libel only when the tortfeasor has acted with actual malice, or "with such gross negligence and carelessness as to indicate a wanton disregard of the plaintiffs' rights." Campanella v. Pursley, Sup.Ct., 1960, 25 Misc.2d 54, 202 N.Y.S. 2d 539, 543; Holmes v. Jones, 1895, 147 N.Y. 59, 41 N.E. 409. Without repeating our earlier discussion of the state of defendant's corporate mind, we believe it is determinative of this issue. Defendant had every reason to believe that plaintiff had authorized the article. The evidence would not warrant a finding that it was reckless in its selection of MRA, or in its reliance upon Murphy's reports of the doctors' supposed activities. Under these circumstances, to impute to defendant Murphy's knowledge of his own violation of the agreement would punish defendant when it was not blameworthy. Cf. Cleghorn v. New York C. & H.R.R.R., 1874, 56 N.Y. 44; Restatement (Second), Agency § 217C. The finding of punitive damages cannot stand.

Judgment will be entered vacating the judgment of the District Court and setting aside the general verdict and the findings inconsistent with this opinion, and remanding the action for trial on the issue of compensatory damages for libel.

13. This aspect of the case raises two interesting questions of choice of law which we note, but which, because of our disposition of the issue on the merits, we do not answer. One is whether the law of New York is applicable at all. Compare Zuck v. Interstate Publishing Corp., 2 Cir., 1963, 317 F.2d 727, 734; Dale System v. Time, Inc., D.Conn., 1953, 116 F. Supp. 527; Kelly v. Loew's, Inc., D.Mass., 1948, 76 F.Supp. 473; Curley v. Curtis Publishing Co., D.Mass., 1942, 48 F.Supp. 29; Restatement (Second), Conflict of Laws § 379e (Tent. Draft No. 9, 1964), with Hartmann v. Time, Inc., 3 Cir., 1948, 166 F.2d 127, 1 A.L.R.2d 370, cert. den. 334 U.S. 838, 68 S.Ct. 1495, 92 L.Ed. 1763; Brewster v. Boston Herald-Traveler Corp., D.C.Mass., 1960, 188 F.Supp.

565; O'Reilly v. Curtis Publishing Co., D.Mass., 1940, 31 F.Supp. 364. The other, assuming New York law is otherwise applicable, is whether Mass.G.L. c. 231, § 93, which provides that "[i]n no action of slander or libel shall exemplary or punitive damages be allowed," would preclude an award of punitive damages for publications within New York. Cf. Cheatham & Reese, Choice of the Applicable Law, 52 Colum.L.Rev. 959, 961 (1952); Lauritzen v. Larsen, 1953, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254; Leflar, Extrastate Enforcement of Penal and Governmental Claims, 46 Harv.L.Rev. 193, 210–211 (1932). But cf. Restatement (Second), Conflict of Laws § 612 (Tent. Draft No. 11, 1965).