[No. D004993. Fourth Dist., Div. One. Apr. 23, 1987.]

SHELDON WASSER et al., Plaintiffs and Appellants, v.
SAN DIEGO UNION, Defendant and Respondent.

1456

**COUNSEL**

David A. Stevens and Sherri Sobel Sokoloff for Plaintiffs and Appellants.

Luce, Forward, Hamilton & Scripps, Gregory D. Roper and Harold W. Fuson, Jr., for Defendant and Respondent.

**OPINION**

**TODD, J.**—On April 12, 1985, Sheldon Wasser, his current wife, Lynn Wasser, and his children, Laurie Wasser and Daren Wasser, filed this action

against the San Diego Union for invasion of privacy, intentional infliction of emotional distress, and negligence, as a result of a newspaper article published by the San Diego Union.[1]

In response to the motion of the San Diego Union, the trial court granted summary adjudication of certain issues by minute order on May 13, 1986[2]

---

[1]The newspaper article reads as follows: '*Teacher sues Grossmont district Monte Vista principal*

"A special education teacher at Monte Vista High School in Spring Valley has filed suit against his principal, alleging that a teacher evaluation report libeled him.

"Sheldon Wasser seeks unspecified damages from the Grossmont Union High School District and Monte Vista Principal Patrick M. Carroll alleging the evaluation report 'was inappropriate, inaccurate and libelous.'

"He alleges the report damaged his reputation and restricted advancement in his career.

"Wasser, a teacher at Monte Vista since 1970, is head of the school's special education department.

"While his evaluation states that Wasser 'meets or exceeds district expectations' in all evaluated areas, Wasser objects to Carroll's comments about problems within the special education department.

"Carroll wrote that he had to intervene in disputes that arose between Wasser and staff members who had alleged Wasser went beyond the scope of his responsibilities as department chairman during staff meetings.

"Carroll wrote in Wasser's evaluation that Wasser 'appears to have personalized attempts at resolution and has responded by intensifying efforts to prove his position in conflict.'

"Wasser claimed in his suit that Carroll and the district were aware of his susceptibility to stress and were intentionally provoking him into a stressful situation.

"In 1974, Wasser was acquitted of a murder charge in an incident in which his estranged wife, Brenda, was shot in the head with a small caliber pistol. Wasser claimed the gun went off accidentally.

"The prosecution contended Wasser shot her because she left him for another man."

[2]The minute order reads in pertinent part: "[Union's] motion for summary judgment/summary adjudication, as to issues 1, 3, 4, 5 and 6, taken under submission on April 22, 1986, is granted with summary adjudication in favor of defendant.

"The question, as to the above issues for summary adjudication, turns on whether or not the publication respecting [Wasser] was one which related to a public figure and consisted of previous publications respecting this public figure which were, as a matter of law, privileged to be republished upon his reappearance in the public domain.

"Plaintiff relies upon the concept that the information previously published had become so outdated or old that it should not have been republished when the plaintiff reappeared in the public eye.

"The case of *Diaz* v. *Oakland Tribune, Inc.* (1983) 139 C.A. 3d 118 [188 Cal.Rptr. 762], relied upon by defendant, did not involve republication of a previously published newspaper article respecting the emergence of *Diaz* as a public figure. The *Briscoe* v. *Reader's Digest, Inc.* (1971) 4 C.3d [529] 532 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1] and *Melvin* v. *Reid* (1931) 112 C.A. 285 [297 P. 91] cases were also cases in which the plaintiff had done nothing to reattract public attention so as to justify republication of information which had previously been in the public domain.

"In the *Briscoe* and *Melvin* cases, the second publication was strictly for purposes independent of any current activity of the plaintiff and the plaintiff's name was revived for reasons about which the plaintiff had absolutely no connection.

"That is not the case presented here. In this instance, the plaintiff reemerged as a public figure on his own volition and the republication of newspaper articles cannot constitute an unprivileged publication by defendant The San Diego Union. It simply would be an impossible

Following denial of a petition for writ of mandate in this court, the trial court issued a second formal order summarily adjudicating issues on July 14, 1986, upon which judgment was rendered for defendant San Diego Union on July 29, 1986.

FACTS

On March 6, 1985, the San Diego Union (Union herein) published a newspaper article concerning Sheldon Wasser's (Wasser herein) civil action against Grossmont Union High School District where Wasser is employed as a teacher. Wasser alleged certain negative comments in a performance evaluation issued about him were intended to cause him stress. The newspaper article of March 6, 1985, states Wasser had been acquitted of murdering his then wife, Brenda, in 1974. The article reports Wasser's murder trial contention the gun went off accidently; it also relates the prosecution's contention that Wasser shot Brenda because she had left him for another man. The appellants concede the truth of the matters contained in the newspaper article.

News articles concerning Brenda's killing in 1974 were published by the Union and the San Diego Tribune. Wasser's acquittal by the jury on November 12, 1974, was reported in both newspapers on November 13, 1974. Wasser's children, Laurie and Daren, filed a civil action against Wasser for their mother's wrongful death on February 6, 1975. Again, the Union published a report of the filing of this action. This case was settled, with court approval, when Wasser paid his minor children $73,000.

---

circumstance for the newspaper, on each occasion it wished to publish historic information about a public figure, to measure whether the information was too old or too remote to justify its republication.

"*Cox Broadcasting Co.* v. *Cohn* (1975) 420 U.S. 469 [43 L.Ed.2d 328, 95 S.Ct. 1029] and *Smith* v. *Daily Mail Publishing Co.* (1979) 443 U.S. 97 [61 L.Ed.2d 399, 99 S.Ct. 2667] clearly reveal that once truthful information was publicly revealed or in the public domain the Court could not constitutionally restrain its dissemination. Certainly California law is in harmony. *Werner* v. *Times-Mirror Co.* (1961) 193 Cal.App.2d 111 [14 Cal.Rptr. 208] endorses the right of the press to revive matters of public history concerning a past public figure. Quoting Prosser, the *Werner* decision at page 118 states: [¶] 'There can be no doubt that one quite legitimate function of the press is that of educating or reminding the public as to past history, and that the recall of former public figures, the revival of past events that once were news, can properly be a matter of present public interest. . . . Such decisions indicate that once a man has become a public figure, or news, he remains a matter of legitimate recall to the public mind to the end of his days.'

"Summary adjudication should be granted as to issues 1, 3, 4, 5 and 6.

"Dated: <u>May 9, 1986</u> <u>P. BURKE-JENNINGS</u>
 ARTHUR W. JONES
 Judge of the Superior Court"

On June 5, 1975, Wasser sued the County of San Diego, District Attorney Edwin Miller, and Deputy District Attorney Alan Fenton (prosecutor in Wasser's murder case), and the San Diego County Board of Supervisors (as a Board and individually), alleging slander for comments made by Fenton immediately following Wasser's acquittal on the murder charges. Wasser stipulated to a dismissal of this action on March 15, 1976.

On February 27, 1975, Wasser sued Charles Knight to recover an alleged loan from Brenda Wasser to Mr. Knight. In 1978, Wasser successfully defended a collection suit for medical treatment rendered to Brenda before her death. Then in 1979, Wasser sued those responsible for this collection suit, claiming malicious prosecution and intentional infliction of emotional distress. Wasser dismissed this suit in 1980. The San Diego Tribune published a news story about this litigation, again mentioning the murder trial background.

Because we have determined the material printed was newsworthy, we affirm the judgment of the trial court.

## DISCUSSION

■ The cause of action for invasion of privacy includes three elements: (1) Public disclosure of (2) private facts which are (3) offensive and objectionable to a reasonable person of ordinary sensibilities. (*Sipple* v. *Chronicle Publishing Co.* (1984) 154 Cal.App.3d 1040, 1045 [201 Cal.Rptr. 665].) In this case, the news article complained of constitutes the public disclosure required in the first element. ■ As to the second element, publication of private facts means the unwanted publication of intimate details of one's private life which are outside the realm of legitimate public interest. "It is, of course, axiomatic that no right of privacy attaches to a matter of general interest that, has already been publicly released in a periodical or in a newspaper of local or regional circulation (*Sperry Rand Corporation* v. *Hill* (1st Cir. 1966) 356 F.2d 181, 185 [23 A.L.R.3d 853])." (*Id.* at p. 1048.)

■ In addition, the supreme mandate of the constitutional protection of freedom of the press provides that even a tortious invasion of privacy is exempt from liability if the publication of private facts is truthful and newsworthy. In interpreting Restatement Second of Torts section 652D,[3] cases and authorities make it clear this protection is afforded by the First Amendment of the United States Constitution. Comment d to Restatement section

---

[3]Restatement Second of Torts section 652D reads: "One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that [¶] (a) would be highly offensive to a reasonable person, and [¶] (b) is not of legitimate concern to the public."

652D states in pertinent part: "When the subject-matter of the publicity is of legitimate public concern, there is no invasion of privacy. [¶] This has now become a rule not just of the common law of torts, but of the Federal Constitution as well." (Accord *Cox Broadcasting Corp.* v. *Cohn* (1975) 420 U.S. 469 [43 L.Ed.2d 328, 95 S.Ct. 1029]; *Time, Inc.* v. *Hill* (1967) 385 U.S. 374, 383 [17 L.Ed.2d 456, 464, 87 S.Ct. 534]; see also *Forsher* v. *Bugliosi* (1980) 26 Cal.3d 792, 809-810 [608 P.2d 716]; *Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529, 541 [93 Cal.Rptr. 866, 483 P.2d 34, 57 A.L.R.3d 1]; *Kapellas* v. *Kofman* (1969) 1 Cal.3d 20, 35-36 [81 Cal.Rptr. 360, 459 P.2d 912].)

■ Because of the first amendment protection, the summary judgment procedure has become an approved method of resolving privacy cases, since protracted litigation would have a chilling effect on the exercise of free speech in the public forum. (*Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672, 685 [150 Cal.Rptr. 258, 586 P.2d 572]; *Desert Sun Publishing Co.* v. *Superior Court* (1979) 97 Cal.App.3d 49, 53 [158 Cal.Rptr. 519].)

The standard for resolution of a summary judgment motion is not altered. If a triable issue of fact exists, summary judgment is improper. However, the "courts impose more stringent burdens on one who opposes the motion and require a showing of high probability that the plaintiff will ultimately prevail in the case. In the absence of such showing the courts are inclined to grant the motion and do not permit the case to proceed beyond the summary judgment stage. [Citations.]" (*Sipple* v. *Chronicle Publishing Co., supra,* 154 Cal.App.3d at p. 1046-1047.)

■ Wasser contends prejudicial error in the trial court's finding the murder trial story was newsworthy as a matter of law. He argues this issue must be determined in an adversarial trial. Union argues the newsworthiness of the information is a complete defense to Wasser's claim. ■ California authority has developed a three-part test for newsworthiness: (a) The social value of the facts published; (b) the depth of the intrusion into ostensibly private affairs; and (c) the extent to which an individual voluntarily acceded to a position of public notoriety. (*Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d 529, 541; *Forsher* v. *Bugliosi, supra,* 26 Cal.3d 792, 811-812; *Kapellas* v. *Kofman, supra,* 1 Cal.3d 20, 36.) *Sipple* v. *Chronicle Publishing Co., supra,* 154 Cal.App.3d 1040, 1048, quotes *Virgil* v. *Time, Inc.* (9th Cir. 1975) 527 F.2d 1122, 1129; " ' "In determining what is a matter of legitimate public interest, account must be taken of the customs and conventions of the community; and in the last analysis what is proper becomes a matter of the community mores. *The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a*

*morbid and sensational prying into private lives for its own sake,* with which a reasonable member of the public, with decent standards, would say that he had no concern." ' (Italics added.) (Accord Rest. 2d Torts, § 625D, com. h.)"

█ Clearly, the Union published material already public when it detailed facts surrounding Wasser's murder trial and acquittal in the 1985 report of his suit against his employer. These matters were already publicly printed in no less than seven articles between 1974 and 1985, as shown in the record before us. █ Newspaper stories of criminal charges and public judicial proceedings are protected under the First Amendment of the United States Constitution. (*Cox Broadcasting Co.* v. *Cohn, supra,* 420 U.S. 469.) █ Wasser contends, however, that the passage of time, coupled with his own life circumstances since 1974, had ended his status as a public personage concerning the murder story. █ "But even though a newspaper article may refer to a person who has at some time gained the status of a public personage, a difficult problem is the effect of the lapse of time upon the right to publish matters which, when they were current, were clearly of legitimate interest to the public. . . . In the course of his recent discussion of the subject, Prosser states, in part: 'There can be no doubt that one quite legitimate function of the press is that of educating or reminding the public as to past history, and that the recall of former public figures, the revival of past events that once were news, can properly be a matter of present public interest. . . . Such decisions indicate that once a man has become a public figure, or news, he remains a matter of legitimate recall to the public mind to the end of his days.' (Prosser, *Privacy,* 48 Cal.L.Rev. 383, 418.)" (*Werner* v. *Times-Mirror Co.* (1961) 193 Cal.App.2d 111, 117-118 [14 Cal.Rptr. 208].)

In the dissent to *Werner,* it is pointed out: " 'The dividing line between the individual right and the so-called public right is not easily drawn and must be determined in every instance by the facts of each case.' (*Stryker* v. *Republic Pictures Corp.* (1951), 108 Cal.App.2d 191, 194 . . . .)" (*Id.* at p. 124.)

█ Further, the original judicial records remain open to public scrutiny. While Wasser claims no desire to be the object of public scrutiny, Restatement Second of Torts section 625D, comment f, illustrates even involuntary notoriety can be newsworthy and nonactionable: █ "There are other individuals who have not sought publicity or consented to it, but through their own conduct or otherwise have become a legitimate subject of public interest. They have, in other words, become 'news.' . . . These persons are regarded as properly subject to the public interest, and publishers are permitted to satisfy the curiosity of the public as to its heroes, leaders,

villains and victims, and those who are closely associated with them. As in the case of the voluntary public figure, the authorized publicity is not limited to the event that itself arouses the public interest, and to some reasonable extent includes publicity given to facts about the individual that would otherwise be purely private." (Accord *Virgil* v. *Time, Inc., supra,* 527 F.2d 1122, 1129.)

■ Under these standards, Wasser's history back through the events of 1974 is newsworthy as a matter of law. It is common knowledge criminal charges and their resolution, marriages and their dissolution, legal disputes between family members, and civil litigation almost without limitation, are customarily reported by radio, television and newspaper media. In Wasser's case, each step in the continued series of legal actions maintained—even whetted—the public interest in him and his family. Finally, the allegation his school employers knew of his susceptibility to stress rekindles the public interest in his stressful history.

Wasser's reliance on *Briscoe* v. *Reader's Digest Association, Inc., supra,* 4 Cal.3d 529; *Conklin* v. *Sloss* (1978) 86 Cal.App.3d 241 [150 Cal.Rptr. 121]; and *Diaz* v. *Oakland Tribune, Inc.* (1983) 139 Cal.App.3d 118 [188 Cal.Rptr. 762] is misplaced.

In *Briscoe,* the publication concerned a crime committed by the plaintiff some 11 years earlier. Plaintiff had removed himself from the public eye, had established himself as a law abiding man and was raising a family. The publication suddenly brought this offensive history to plaintiff's friends and family for the first time. Similarly, in *Conklin,* information of a serious criminal conviction (murder of Conklin's brother-in-law) was published 20 years after the event and after Conklin had remarried, fathered two children and rehabilitated himself. In *Diaz,* plaintiff had meticulously kept secret her former identity in order to preserve secrecy as to her sex-change operation. This information was made public in an article as a result of her student political activities in a community college, a matter totally unrelated to her transexual situation.

These three cases are readily distinguished from Wasser's circumstances. Largely through his own lawful choices, Wasser had continued to rekindle public interest in his criminal trial and acquittal by engaging in one public lawsuit after another, all of which bore some relationship to the 1974 incidents. Even the 1985 suit against his employers referred by implication to the original stressful circumstances of 1974 by alleging his employers knew of his susceptibility to stress. In contrast to plaintiffs Briscoe, Conklin and Diaz, Wasser truly remained in or near the public eye during the entire period between 1974 and 1985.

### Conclusion

There has been no abuse of discretion in granting summary adjudication on the issue of newsworthiness of the questioned article. Newsworthiness has been established as a matter of law.

Since the decision on newsworthiness defeats an essential element of Wasser's claim, we do not discuss other defenses asserted by Union.

### Disposition

The judgment of the trial court is affirmed.

Wiener, Acting P. J., and Work, J., concurred.

A petition for a rehearing was denied May 12, 1987, and appellants' petition for review by the Supreme Court was denied July 15, 1987.