Yolanda BAUGH and Donyelle Baugh, Plaintiffs,

v.

CBS, INC., Group W Television, KPIX, and Dan Moguloff, Defendants.

No. C 93–0601 FMS (ARB).

United States District Court, N.D. California.

June 22, 1993.

Robert E. Kroll, Oakland, CA, John Douglas Moore, Stone & Moore, San Francisco, CA, for plaintiffs.

Neil L. Shapiro, Michelle D. Kahn, Brobeck Phleger & Harrison, San Francisco, CA, Douglas P. Jacobs, Los Angeles, CA, Douglas P. Jacobs, Madeleine Schachter, New York City, for defendants.

## ORDER

FERN M. SMITH, District Judge.

Plaintiffs Yolanda Baugh ("Baugh") and her daughter, Donyelle Baugh, have filed suit alleging various torts arising from an episode of "STREET STORIES," a weekly news magazine produced and broadcast by Defendant Columbia Broadcasting System, Inc. ("CBS"). Plaintiffs have also named Group W Television, Inc., the owner of CBS' San Francisco affiliate KPIX–TV ("Group W"), and Dan Moguloff ("Moguloff"), field producer for STREET STORIES as Defendants. All Defendants move to dismiss the claims

or, in the alternative, for summary judgment. In addition, Defendant Group W moves for dismissal or summary judgment on the basis that it is merely a conduit of the network broadcast. Plaintiffs move for summary judgment on their trespass and unfair competition claim. Finally, Plaintiffs move for relief from the automatic referral to arbitration under Local Rule 500. For the reasons set forth below, the Court DISMISSES the claims for appropriation of likeness, intrusion on seclusion, trespass, unfair competition, and negligent infliction of emotional distress, but DENIES Defendants' motions with respect to the disclosure of private facts, fraud, and intentional infliction of emotional distress claims.

## BACKGROUND

CBS describes STREET STORIES as a "weekly news and public affairs magazine." The segment at issue was entitled "Stand by Me" and was broadcast over the CBS Network on April 9, 1992 ("the Broadcast").

The Broadcast concerned the Mobile Crisis Intervention Team, run by the Alameda County District Attorney, which is designed to provide emergency assistance for crime victims. The Broadcast focused on the work of Elaine Lopes ("Lopes") who assists victims with emotional support, guidance through the judicial process, and other relevant services. CBS news correspondent Bob McKeown ("McKeown") followed Lopes and filmed several of her visits with crime victims, showing how Lopes provided needed guidance for these victims. McKeown's report also described how Lopes aided in successful prosecution of crimes because she often provided victims with the emotional support they need to testify effectively. In addition, McKeown noted that the victims assistance program is funded entirely by fines levied against criminals and that the recession had made these fines more difficult to collect.

Later in the Broadcast, the voice of a police dispatcher is heard stating, "husband beat up wife. Broke windows in the house. And she's waiting there." Broadcast Transcript ("Tr.") at 11 (Declaration of Madeleine Schachter, Exh. 1). The Broadcast then showed footage of Lopes and others inside the victim's home:

McKeown: (Voiceover)

Minutes after the police arrive, Elaine Lopes and her team are on the scene. They're professional victims' advocates, trained to pick up the pieces of lives touched—sometimes shattered—by crime.

Unidentified Woman # 1:[1]

He started beating on me and kicking on me and hitting me in the face. And then he kept bullying at me, talking about, 'You ain't going to do nothing.' You know, just bullying me like, you know, he knew I was scared of him.

McKeown: (Voiceover)

This time it's a report of domestic violence.

(Sounds of woman crying)

Ms. Lopes:

I think you feel like you're—like right here on trial and you're not. OK?

(Footage of Lopes in car with McKeown)

Ms. Lopes:

We are helping them right from the beginning. You help them put the control back—you begin to put the control back because you're there at the beginning, a—you know, right after the crime has occurred.

(Footage of Lopes and others in victim's home)

Ms. Lopes:

It's OK. It's OK. Hey it's going to be OK. You know, hardest thing, probably is when you're having to sit here to give the officer the report, because he's going

---

1. In the version broadcast over KPIX and KMST (Monterey, CA), Baugh's face was obscured. Donyelle Baugh's face was not obscured, however. In addition, some Bay Area viewers with cable TV have access to CBS affiliate KXTV (Sacramento, CA) which broadcast the unobs-

cured version of STREET STORIES. For example, one of Baugh's former employers subscribes to Multivision cable in Fairfield, CA and viewed the unobscured version over KXTV. Decl. of Helen Summers at ¶ 5.

to have to know every detail, everything that happened.

McKeown: (Voiceover)

Elaine's encouragement makes it easier for the victim to make her case.

(Footage of woman #1 and police officer in kitchen)

Woman #1:

He hit me.

Unidentified Police Officer #1:

What do you mean, hit you? Did he punch you?

Woman #1:

(Demonstrates attacker's stance) He was like this over me, doing like this. And he kicked me on the floor!

Officer #1:

OK. That's what I was asking you . . .

(Close-up of pamphlet: Victim and Witness Assistance, then footage of Lopes with woman #1)

Ms. Lopes:

I'm Elaine. I'm the one that'll follow through today. And if I don't, you know, end up working with you through the court process—if it goes through the court process—I will assign one of my staff. But more than likely, it'll be me.

(Voiceover)

Once you've been victimized, your life will never be the same.

(Footage of Lopes and others leaving woman #1's home)

Unidentified Woman #2:

We'll be in touch, OK?

Woman #1:

Yeah.

Woman #2:

Thanks for letting us come in to talk to you.

Ms. Lopes:

And I'll talk to you tomorrow.

Woman #2:

Bye, girls. Bye Danielle.

Tr. at 11–12.

Baugh presents the following version of the events that transpired at her home on January 21, 1992:

On January 21, 1992, I called the Oakland Police "911" emergency number to report an incident of domestic violence involving my husband and myself at our home . . . The policeman and I were in the kitchen discussing the incident when I heard some people coming up the front steps and entering my home.

I ran to the front of the house, and told the intruders "Wait a minute. Who are you? Get the hell out of here." They withdrew out of the door, showing me no identification. I did not notice the video camera at that point.

The officer came out of the kitchen. In the presence of the people on my doorstep, the officer said something to the effect: "It's okay. They are from the DA's office. They are here to help you." The door was left ajar.

The officer said that the group was a mobile crisis team sent to assist victims of domestic violence.

On the strength of that assurance, made in front of the film crew and within their hearing, I allowed the people to enter my home, not realizing who they really were or what their actual purpose was.

I saw that one of the people entering my home held a video camera. I believe he was filming as he entered the home, and he might have been filming when I originally threw these people out of my home.

The people introduced themselves as members of a Victim–Witness program. A woman introduced herself as "Elaine," who turned out to be Elaine Lopes, the leader of the mobile crisis team. Elaine introduced me to another woman and a man. The others, two or three men, including the man with the camera, were not introduced.

I asked the group what the camera was for. One of the crew members said they were doing a segment on Elaine for the District Attorney's office.

The crew member did not say they were doing this for CBS, KPIX, or the Street Stories program. Nor did they mention that the film would be used commercially in any way.

I said I had no objections to them doing some filming of Elaine for the DA's office, as long as *I* was not going to be on anyone's television. The crew member said, "Okay." If they had not agreed to my condition, I would not have permitted them to stay.

Declaration of Yolanda Baugh ("Baugh Decl."), ¶¶ 2–13.

Baugh further asserts that she did not find out that her story would be broadcast until March 23, 1992[2] when Lopes mentioned, "Oh by the way, the show will be aired April 9," to which Baugh responded, "What show?" *Id.* at ¶ 17. Baugh asserts that the following events occurred:

I reminded her [Lopes] that I had told her and the others that I did not want to be on television. She told me, "It may be too late." She said she had no control over the situation. I told her she should do whatever necessary to prevent "Street Stories" from using me in the show.

Elaine said she would call the CBS producer in New York to discuss the problem, and then call me back. Later, she called me back and said CBS had already cut the film and it was going to be aired with me in it. I got the name and phone number of the CBS "Street Stories" producer, Dan Moguloff, from Elaine, and immediately called him from my office.

I told Mr. Moguloff who I was and reminded him I did not want any of my personal life aired on any television show. He said there was nothing he could do at that point, though he might be able to obscure my face on the screen. He was not sure he could obscure me, but there was no way to stop the show from airing. I told him that would not be sufficient. I told him that if I was on the show, I would take legal action and hung up on him …

Before I left work, I wrote a letter to Mr. Moguloff demanding that my image not be used in the program, and again threatened legal action if my request was not honored … I never heard from Mr. Moguloff again after sending the letter.

However, about a week later, I was contacted on the phone by a man who identified himself as a CBS lawyer in New York. In a rude, uncaring and arrogant tone, he told me that I had no case against CBS and there is nothing I could do.

Baugh Decl. ¶¶ 18–23.

## ANALYSIS

■ A motion to dismiss may not be granted unless it appears "to a certainty that the plaintiff would not be entitled to relief under any set of facts that could be proved." *Plaine v. McCabe,* 797 F.2d 713, 723 (9th Cir.1986). The Court must therefore accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them. *NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986). The Court, however, need not accept as true conclusory allegations, unreasonable inferences nor unwarranted deductions of fact. *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.), *cert. denied,* 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981).

Defendants have alternatively moved for summary judgment. While no discovery has occurred because of General Order No. 34, the parties have submitted various declarations, a transcript of the Broadcast, and videotapes of the Broadcast. In order to withstand a motion for summary judgment, the opposing party must set forth specific facts showing there is a genuine issue of material fact in dispute. Fed.R.Civ.P. 56(e). Those facts must amount to "sufficient evidence favoring the [opposing] party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In the absence of such facts, "the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

■ Summary disposition is particularly favored in cases involving First Amendment rights. *Okun v. Superior Court,* 29 Cal.3d 442, 460, 175 Cal.Rptr. 157, 629 P.2d 1369

---

**2.** Baugh had several conversations with Lopes between January 21 and March 23 and Lopes never mentioned the film, CBS, or STREET STORIES during any of these conversations. Baugh Decl. ¶ 16.

(1981) ("speedy resolution of cases involving free speech is desirable to avoid a chilling effect upon the exercise of First Amendment rights") (quotation omitted), *cert. denied*, 454 U.S. 1099, 102 S.Ct. 673, 70 L.Ed.2d 641 (1981); *Baker v. Los Angeles Herald Examiner*, 42 Cal.3d 254, 269, 228 Cal.Rptr. 206, 721 P.2d 87 (1986), *cert. denied*, 479 U.S. 1032, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987). In addition, some courts have imposed a heightened burden on the party opposing summary judgment. *See Wasser v. San Diego Union*, 191 Cal.App.3d 1455, 1461, 236 Cal.Rptr. 772 (1987) ("The standard for resolution of a summary judgment motion is not altered ... However, the courts impose more stringent burdens on one who opposes the motion and require a showing of high probability that the plaintiff will ultimately prevail in the case. In the absence of such showing the courts are inclined to grant the motion and do not permit the case to proceed beyond the summary judgment stage.").

## I. Appropriation of Likeness for Commercial Purposes

■ Plaintiff's appropriation claim is based on Cal. Civil Code § 3344(a) which provides:

Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner or on or in products, merchandise, or goods, or for the purpose of advertising or selling, or soliciting purchases of products, merchandise, goods or services, without such person's prior consent ... shall be liable for any damages sustained by the person or persons injured as a result thereof.

■ Such appropriation claims may present one of two theories. The first type of appropriation is the right of publicity and arises from the "commercially exploitable opportunities" embodied in the plaintiff's likeness. *Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536, 542, 18 Cal.Rptr.2d 790 (1993). This case presents the second type of appropriation in which the "appropriation of the name and likeness [ ] brings injury to the feelings, that concern's one's own peace of mind, and that is mental and subjective." *Id.* Defendants argue that they are immune from

liability for either type of appropriation, unless the appropriation constitutes pure commercial exploitation and is unrelated to legitimate newsgathering and dissemination. Indeed, the statute itself provides for a "news account" exception:

For purposes of this section, a use of a name, voice, signature, photograph, or likeness in connection with any news, public affairs, or sports broadcast or account, or any political campaign, shall not constitute a use for which consent is required under subdivision (a).

Cal Civil Code § 3344(d). Moreover, the fact that STREET STORIES generates advertising revenue does not prevent CBS from claiming news account immunity. *Leidholt v. L.F.P. Inc.*, 860 F.2d 890, 895 (9th Cir.1988) ("The fact that Hustler Magazine is operated for profit does not extend a commercial purpose to every article within it."). Rather, the appropriate focus is on the use of the likeness itself; if Baugh's face was used "in connection" with a news account, then no liability may be found.

■ Plaintiffs argue that Defendants forfeited any privilege because the STREET STORIES broadcast was "patently false, misleading and sensationalized." Plaintiffs rely on *Eastwood v. Superior Court*, 149 Cal.App.3d 409, 425, 198 Cal.Rptr. 342 (1983), in which the court noted, "we do not believe that the Legislature intended to provide an exemption from liability for a knowing or reckless falsehood under the canopy of 'news.' We therefore hold that Civil Code section 3344, subdivision (d), as it pertains to news, does not provide an exemption for a knowing or reckless falsehood." Plaintiff argues that by mixing this videotape with other episodes in the broadcast, STREET STORIES sensationalized the event at the Baugh's home and forfeited its news account protection.

■ Plaintiffs' argument fails. In *Eastwood*, the publication pertained to actor Clint Eastwood's involvement in a "love triangle" that never existed. In this case, there is no dispute that the broadcast was not "false" in the sense of *Eastwood*. *See Maheu v. CBS, Inc.*, 201 Cal.App.3d 662, 677, 247 Cal.Rptr.

**754**

304 (1988) (characterizing the holding of *Eastwood* as "had the article not been alleged to be entirely false, it would have come within the exemption set forth in Civil Code section 3344, subdivision (d)"). Defendants videotaped and broadcast an actual event that occurred at Plaintiffs' home. In addition, while STREET STORIES is not a traditional news show, it is plainly a "news or public affairs" broadcast in the broad sense and is therefore entitled to protection.

Plaintiffs would like the issue of "newsworthiness" submitted to a jury because it depends on community standards. *Virgil v. Time, Inc.*, 527 F.2d 1122, 1129 (9th Cir. 1975). While a jury question may arise in many cases, it does not arise in this case. In the age of "channel-surfing," [3] news organizations are hard-pressed to disseminate information in a manner that will capture the viewers attention. STREET STORIES is simply one attempt at presenting news in a more compelling fashion. Subjecting news organizations to a jury trial every time they develop a new program format and style would place on unreasonable burden on the exercise on free speech. *See Wasser*, 191 Cal.App.3d at 1461, 236 Cal.Rptr. 772 (summary disposition "has become an approved method of resolving privacy cases, since protracted litigation would have a chilling effect on the exercise of free speech in the public forum").

■ Moreover, California courts have indicated that § 3344(d) should be interpreted to cover a broad range of material. Even if the Court assumes that STREET STORIES does not fit the traditional notion of news, it undoubtedly is protected under the category of public affairs:

> Section 3344, subdivision (d) distinguishes between news and public affairs. We presume that the Legislature intended that the category of public affairs would include things that would not necessarily be considered news ... We also presume that the term "public affairs" was intended to mean something less important than news ... As has been established in the cases involving common law privacy and appropriation, the public is interested in and constitutionally entitled to know about things, people, and events that affect it. *Dora*, 15 Cal.App. 4th 536, 546, 18 Cal. Rptr.2d 790 (1993 Cal.App. Lexis 473, *13).

■ Finally, Plaintiffs argue that Defendants "public interest" defense evaporates when there is no need to use Plaintiffs' likeness. Since Defendants could have substituted another victim of domestic violence for Baugh, Plaintiffs argue that California courts would tilt the scales in favor of the Plaintiffs privacy interest, citing *Gill v. Curtis*, 38 Cal.2d 273, 239 P.2d 630 (1952) and *Gill v. Hearst Publishing Co.*, 40 Cal.2d 224, 253 P.2d 441 (1953). The *Gill* cases involved a picture of a couple in a romantic pose in an ice cream store and was used to illustrate an article entitled, "Love" in Ladies' Home Journal. In the first case, the California Supreme Court held that plaintiffs had stated a plausible claim for invasion of privacy because there was no pressing need for the use of plaintiffs' likeness. *Curtis* 38 Cal.2d at 281, 239 P.2d 630. In the second case, the California Supreme Court relied on the constitutional protection accorded to publications, "whether it be a news report or an entertainment feature" and concluded that "the photograph did not disclose anything which until then had been private, but rather only extended knowledge of the particular incident to a somewhat larger public than had actually witnessed it at the time of the occurrence." *Hearst*, 40 Cal.2d at 230, 253 P.2d 441. The key element that emerges from the *Curtis* cases is that "the right 'to be let alone' and to be protected from undesired publicity is not absolute but must be balanced against the public interest in the dissemination of news and information consistent with the democratic processes under the constitutional guaranties of freedom of speech and of the press." *Hearst*, 40 Cal.2d at 228, 253 P.2d 441. § 3344(d) makes clear, however, that when news or public affairs publications are involved, the balance must be drawn strongly in favor of dissemination. Given the limits imposed by § 3344(d) and California's preference for speedy resolution

---

**3.** Since many viewers have remote controls, they can quickly switch among stations. TV programming faces increasing pressure to find ways to maintain viewers' attention.

of free speech cases, the Court finds that Plaintiffs have failed to state a claim for appropriation of likeness and therefore this claim is DISMISSED.

## II. Disclosure of Private Facts

▉ Defendants argue that this claim must be dismissed for three independent reasons. First, Defendants contend that the matters disclosed were not private facts because they were contained in a publicly available police report of the incident. This argument fails, however, because STREET STORIES did not merely broadcast the *facts* contained in the police report. STREET STORIES broadcast the event as it unfolded and effectively disclosed Yolanda Baugh's emotional and personal reactions to the incident as well as her comments to Lopes. The broadcast went far beyond disclosure of facts publicly available in the police report.[4]

▉ Defendants next argue that the facts disclosed were not "degrading." Domestic violence is an exceedingly complex area, and both Yolanda and Donyelle have a legitimate interest in maintaining the integrity and dignity of their family unit. The STREET STORIES broadcast undoubtedly disclosed matters which reasonable people might not want disclosed. At a minimum, this issue presents a question of fact which cannot be resolved at this stage of the proceedings.

▉ Finally, Defendants argue that the broadcast is absolutely privileged because it disclosed "newsworthy matters of legitimate public interest." Plaintiffs respond that whether the broadcast was newsworthy must be determined by a jury. For purposes of this tort, "a truthful publication is constitutionally protected if (1) it is newsworthy and (2) it does not reveal facts so offensive as to shock the community's notions of decency." *Briscoe v. Reader's Digest Association, Inc.,* 4 Cal.3d 529, 541, 93 Cal.Rptr. 866, 483 P.2d 34 (1971).

The Ninth Circuit has explained that "the function of the court is to ascertain whether a jury question [regarding community mores] is presented." *Virgil,* 527 F.2d at 1130. In considering this issue, "the line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake." *Id.* at 1129. In general, California courts are deferential to news stories regarding crime victims. *See Briscoe,* 4 Cal.2d at 536, 93 Cal.Rptr. 866, 483 P.2d 34 ("The circumstances under which crimes occur, the techniques used by those outside the law, the tragedy that may befall the victims—these are vital bits of information for people coping with the exigencies of modern life."). While the Court finds the issue of domestic violence and Lopes' story to be newsworthy, the Court is not yet convinced that Plaintiffs' personal involvement in an incident of domestic violence is newsworthy as a matter of law. The Court therefore DENIES the motion to dismiss the claim for disclosure of private facts.

## III. Uniform Single Publication Act

▉ Defendants contend that Plaintiffs' remaining claims are barred under the Uniform Single Publication Act, Cal.Civil Code § 3425.3 which provides:

No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance, such as any one issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition.

---

4. In addition, it is not completely clear that the police report itself was publicly available. Defendants' counsel requested a copy of the police report pursuant to the California Public Records Act, Cal.Gov.Code §§ 6254 *et seq.* While that request was approved, Plaintiffs contend that under § 6254(f)(2) the request should have been denied. § 6254(f)(2) exempts from disclosure the name and address of a victim of domestic violence. This subsection does allow disclosure of the location of the crime which, in this case, effectively discloses the victim's address. In addition, the name of the victim is withheld *only* if the victim makes a formal request and Plaintiffs have not alleged that Baugh made any such request. At this stage of the proceedings, it appears that disclosure of the record was proper.

California courts have given this section broad preclusive effect:

> The enactment of section 3425.3 of the Uniform Single Publication Act by the California Legislature reflected great deference to the First Amendment and sought to alleviate many problems presented in respect to tort actions where mass communications are involved. When the Legislature inserted the clause *"or any other tort"* it is presumed to have meant exactly what it said.

*Strick v. Superior Court,* 143 Cal.App.3d 916, 924, 192 Cal.Rptr. 314 (1983).

This section bars any claims based on the *broadcast* of Plaintiffs' story. The Court therefore DISMISSES Plaintiffs' claims for intrusion on seclusion, trespass, unfair competition, fraud, and intentional and negligent infliction of emotional distress to the extent they rely on the actual broadcast of STREET STORIES. The claims remain viable, however, to the extent they rely on a tortious *physical* intrusion into Plaintiffs' home. At this stage of the proceedings, the Court must assume the truth of Plaintiffs' assertion that she did not knowingly consent to Defendants' entry into her home. While the publication of Plaintiffs' story may be privileged under § 3425.3, the initial intrusion, if an intrusion occurred, may not be. Any other interpretation would grant complete protection for any tortious act committed by investigative news reporters, simply because they eventually published a story based on their investigations. Nothing in the language of § 3425.3 implies that the California legislature intended such a result.[5]

## IV. Trespass and Intrusion on Seclusion

Baugh admits that she consented to the entry of the camera crew into her home and that she consented to their videotaping her discussions with Lopes, but argues that she did so only because she was led to believe that the crew was making the film for the District Attorney's office and that it would not be used commercially. Baugh Decl. ¶¶ 11–13. Baugh further asserts that she explicitly informed the crew that she had no objections "to them doing some filming of Elaine for the DA's office, as long as I was not going to be on anyone's television" and that a crew member said "Okay." Baugh Decl. ¶ 13. Plaintiffs therefore argue that Baugh's consent was effectively rendered meaningless by the crew member's explicit misrepresentation of their purposes in filming her story.

Trespass is a strict liability tort in the sense that the defendant's motivation or good faith belief is irrelevant. *Miller v. NBC,* 187 Cal.App.3d 1463, 1480–81, 232 Cal. Rptr. 668 ("The defendant is liable for an intentional entry although he has acted in good faith, under the mistaken belief, however reasonable, that he is committing no wrong."). At the same time, no trespass can be found if actual consent to entry was given. *Id.* at 1480, 232 Cal.Rptr. 668 ("Where there is a consensual entry, there is no tort, because lack of consent is an element of the [theory underlying the tort].").

Plaintiffs argue that the consent was not effective because Defendants exceeded the terms of the consent given by Baugh. In general, California does recognize a trespass claim where the defendant exceeds the scope of the consent. Those cases involve defendants *whose intrusion on the land* exceeds the scope of the consent given, however. In this case, the camera crew acted within the scope of Baugh's consent while they were on the premises. If they exceeded the scope of Baugh's consent, they did so by broadcasting the videotape, an act which occurred after

---

**5.** This same argument applies to Defendants' constitutional arguments. Defendants correctly contend Plaintiffs cannot circumvent constitutional free speech protections by recasting privacy claims as other common law torts, such as intentional and negligent infliction of emotional distress. *See Blatty v. New York Times Co.,* 42 Cal.3d 1033, 1042–43, 232 Cal.Rptr. 542, 728 P.2d 1177 (1986). As a result, to the extent the remaining claims are based on the actual publication of Plaintiffs' story, they are barred. At the same time, these constitutional protections do not immunize pre-publication activities. For example, even a public figure is entitled to prevent news reporters from entering a private home. That public figure can maintain a trespass action against a news reporter who climbs his fence, no matter how newsworthy the ultimate story published by the reporter.

they left Baugh's property and which cannot support a trespass claim. *See Mangini v. Aerojet–General Corp.*, 230 Cal.App.3d 1125, 1141, 281 Cal.Rptr. 827 (1991) ("A trespass may occur if the party, entering land pursuant to a limited consent, i.e., limited as to purpose or place, proceeds to exceed those limits by divergent conduct *on the land* of another.") (citations omitted).[6]

■■■ No California cases indicate that the consent must be knowing or meaningful and the Court does not find any reason to add that requirement to the tort. In a case where consent was fraudulently induced, but consent was nonetheless given, plaintiff has no claim for trespass. Of course, a plaintiff in this predicament may still have a remedy based on fraud or intentional misrepresentation.

In pursuing this claim, Plaintiff largely relies on *Miller*, in which an NBC news camera crew followed a paramedic team into the plaintiff's home after plaintiff suffered a heart attack. Under these circumstances, the court held that the victim's wife could maintain an action based on trespass, intrusion, and intentional infliction of emotional distress. In *Miller*, however, no member of the camera crew attempted to obtain plaintiff's consent; they simply barged in with the paramedics. *Id.* 187 Cal.App.3d at 1475, 232 Cal.Rptr. 668. *Miller* does not stand for the proposition that consent must be knowing.[7] The Court therefore DISMISSES Plaintiff's trespass claim.[8]

■■■ Plaintiffs' intrusion on seclusion claim suffers from the same defect. Intrusion on seclusion is shown when "one [ ]

intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private concerns . . . if the intrusion would be highly offensive to a reasonable person." *Miller*, 187 Cal.App.3d at 1482, 232 Cal.Rptr. 668 (citation omitted). Intrusion on seclusion requires neither publication nor "the existence of a technical trespass." *Dietemann v. Time, Inc.*, 449 F.2d 245, 247 (9th Cir.1971). Nonetheless, as with any intentional tort, consent is an absolute defense, even if improperly induced. *See e.g. Cobbs v. Grant*, 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1 (1972) (where patient's consent to operation is not fully informed, but consent was nonetheless given, any damages from the operation must be recovered under a negligence theory not a battery theory). Baugh gave her consent and she therefore has no remedy under this theory. The Court DISMISSES the claim for intrusion on seclusion.

## V. Unlawful Business Practices

■■■ Plaintiffs' claim is based on Cal.Bus. & Prof.Code § 17200 and § 17203. There are two independent problems fatal to Plaintiffs' claim. First, Plaintiffs contend that the unlawful act giving rise to liability under § 17200 is the original trespass at Plaintiffs' home. Since the Court has not found that no trespass occurred, this basis for liability has been eliminated.

Second, § 17203 authorizes injunctions and restitutionary relief, but not damages. Plaintiffs argue that they are not seeking damages but are merely seeking restitutionary relief reflecting the value of what was taken from them. This theory is not plausi-

---

6. The case cited by Plaintiffs, *Civic Western Corp. v. Zila Industries, Inc.*, 66 Cal.App.3d 1, 17, 135 Cal.Rptr. 915 (1977) essentially reaches the same conclusion. In *Civic Western*, the defendant was a repossessor who entered the premises with plaintiff's consent but then proceeded to exceed the scope of the consent by unlawfully ejecting plaintiff's employees from the premises. These activities exceeded the limits of the consent "by divergent conduct *on the land* of another." *Id.* (emphasis added). Plaintiff has not cited any case in which the divergent conduct occurred after the defendant left the plaintiff's property.

7. Nor does *Dietemann v. Time, Inc.*, 449 F.2d 245 (9th Cir.1971). In *Dietemann*, the defendants

gained consensual entry to plaintiff's home by misrepresenting their identity. Defendants then surreptitiously used a hidden camera to photograph plaintiff and a hidden microphone to record their conversation. In these circumstances, the Ninth Circuit found an invasion of privacy, but implied that no "technical" trespass had occurred. *Id.* at 247. In addition, plaintiff never consented in any way to the use of the camera or microphone, a key distinction between *Dietemann* and the present case.

8. Plaintiffs' motion for summary judgment on the trespass claim is therefore DENIED.

ble. Plaintiffs are seeking a remedy for the embarrassment and emotional distress caused by Defendants' publication of the incident at her home. Plaintiff is not arguing that she could have sold her story to another network and that the CBS broadcast effectively misappropriated the value of her story. Under Plaintiffs' approach, any damage claim could be converted into an argument for restitution. § 17203 plainly did not intend such a result.[9] The Court DISMISSES Plaintiffs' claim for relief under this section.[10]

## VI. Intentional and Negligent Infliction of Emotional Distress

■■ Both parties agree that a claim for intentional infliction of emotional distress must be based on "outrageous" conduct. Baugh has alleged that Defendants' personnel entered her home, and misrepresented their identity in order to gain her consent to videotaping, all at a time of extreme emotional vulnerability. Moreover, Defendants selected Baugh specifically because an incident of domestic violence has just occurred; they therefore must have known that Baugh was vulnerable and took advantage of her position. These allegations adequately state a claim for intentional infliction of emotional distress. *See Miller*, 187 Cal.App.3d at 1487, 232 Cal.Rptr. 668 (emotional distress claim viable even if camera crew did not have a "specific malicious or evil purpose"); *Bogard v. Employers Casualty Co.*, 164 Cal.App.3d 602, 616, 210 Cal.Rptr. 578 (1985) ("behavior may be considered outrageous if a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress"). At this stage of the proceedings, the Court cannot say that Defendants' behavior was not outrageous as a matter of law. *See Miller*, 187 Cal.App.3d at 1488, 232 Cal.Rptr. 668 (jury question of outrageousness presented where

camera crew followed paramedics into heart attack victim's home). The motion to dismiss the intentional infliction of emotional distress claim is DENIED.

■■ Plaintiffs' negligence claim is based on the argument that "once Plaintiff notified Defendants that she was misled about their intentions with respect to the videotaping in her home and that she did not want her privacy breached, Defendants had a legal duty not to reveal the embarrassing, private facts about Plaintiff and her daughter." Plaintiff's Opposition at 22. There are two problems with this argument. First, Plaintiffs provide no authority for the proposition that a legal duty arises in this situation and the Court is not aware of any such authority. In the absence of a special duty, the decision to go ahead with the broadcast cannot be the basis for a negligence claim. The Court therefore DISMISSES the claim for negligent infliction of emotional distress.

## VII. Fraud

■■ Defendants move for a more definite statement of Plaintiffs' fraud claim, as required by Fed.R.Civ.P. 9(b). Plaintiff has described the time and place of the alleged misrepresentations, but has failed to identify the persons making some of the misrepresentations. This omission is excusable, however, because the camera crew at Plaintiffs' home failed to provide their names. Since this case is governed by General Order No. 34, no discovery has been allowed. The Court finds that Plaintiffs have sufficiently pleaded their fraud claim at this stage of the proceedings. As discovery proceeds, Plaintiffs shall amend their complaint to specifically identify each individual alleged to have made a misrepresentation to Plaintiffs. The Court DENIES Defendants' motion for a more definite statement.

## VIII. KPIX and Group W's Independent Grounds for Dismissal

■■ Group W and KPIX argue that they merely acted as a conduit for the network's

---

**9.** § 17203 merely authorizes the court to makes orders "necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

**10.** Plaintiff's motion for summary judgment on the unfair business practices claim is therefore DENIED.

broadcast and that none of their personnel were involved in the videotaping at Plaintiffs' home. Under their theory, since they do not edit, review, or in any way control the network's production of STREET STORIES or its broadcast, they lack the requisite scienter for liability.

Group W and KPIX are liable only if their employees were directly involved in the incident at Plaintiffs' home or, in some way, prepared the STREET STORIES segment on Plaintiffs. Defendants have submitted several declarations, all asserting that no KPIX or Group W employees appeared at Plaintiffs' home. *See* Declaration of Stephen Hildebrant, ¶ 6; Supplemental Declaration of Rosemary Roach, ¶ 4 ("Lest there be any lingering doubt on this issue, I wish to clarify that no KPIX–TV cameraman, soundman, or other employee was involved in any way in the videotaping, writing, editing, or other production efforts for the STREET STORIES 1993."). Plaintiff has responded with a declaration from Donald Dunkel, a former journalism professor and currently news manager at an ABC affiliate, asserting that "from personal experience, I am familiar with the various arrangements that are made between CBS, Inc. and its local affiliates … I believe that in the majority of situations when CBS needs a local video camera crew to assist the preparation of a "Street Stories" segment in a major market like San Francisco, someone from the network calls the local affiliate, in this case KPIX, and schedules the use of an affiliate crew and equipment." Declaration of Donald Dunkel, ¶ 6, ¶ 10.

If this evidence had been submitted after full discovery, the Court would find it wholly insufficient to defeat summary judgment. It is not enough to show that CBS sometimes, or even usually, uses a camera crew supplied by the local affiliate; Plaintiffs cannot pin liability on Group W and KPIX unless they can identify specific employees who appeared at Plaintiffs' home. Because of restrictions imposed by General Order No. 34, however, no discovery has been allowed. The Court is therefore reluctant to grant summary judgment simply on the basis of declarations supplied by KPIX and Group W executives. Plaintiff is entitled to sufficient discovery to determine who supplied the camera crew and to determine the identity of each person who appeared at Plaintiffs' home on the evening of January 21, 1992.

The Court DENIES Group W and KPIX's independent motion for dismissal or summary judgment. The Court further ORDERS the parties to pursue immediate and inexpensive discovery sufficient to determine the identity of each member of the crew that appeared at the Baugh home. Unless this discovery shows involvement by Group W or KPIX employees, Plaintiffs shall dismiss Group W and KPIX within sixty (60) days after the identity of the camera crew is disclosed.

## IX. Motion for Relief from Arbitration

█ Plaintiffs move for relief from arbitration pursuant to local rule 500–3. Defendants oppose this motion but both parties agree that referral to the ENE program or to a settlement conference would be productive. Given the complexity of the issues surviving the motions to dismiss, arbitration is unlikely to resolve this case. The Court REMOVES this matter from mandatory arbitration.

## CONCLUSION

For the reasons set forth above, the Court issues the following orders:

(1) The Court DISMISSES the claims for appropriation of likeness, intrusion on seclusion, trespass, unfair competition, and negligent infliction of emotional distress.

(2) The Court DENIES Defendants' motions with respect to the disclosure of private facts, fraud, and intentional infliction of emotional distress claims.

(3) The parties are ORDERED to pursue immediate and inexpensive discovery to determine the identity of the news crew that appeared at Baugh's home on January 21, 1992.

(4) The Court REMOVES this matter from the Court's mandatory arbitration program.

(5) The Court REFERS this matter to the Honorable Claudia Wilken for the purpose of

conducting an early settlement conference and designing a discovery schedule, if necessary. The parties shall contact Magistrate Judge Wilken's chambers forthwith to arrange the settlement conference.

SO ORDERED.